UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| WILLIAM GAY,<br><br>         Petitioner,<br><br>    v.<br><br>LYNN LILLEY, Superintendent of Eastern<br>New York Correctional Facility,<br><br>         Respondent. | No. 24-cv-6424 (JLR)<br><br>ORAL ARGUMENT REQUESTED |

**REPLY MEMORANDUM OF LAW IN SUPPORT OF
WILLIAM GAY'S PETITION FOR A WRIT OF
HABEAS CORPUS UNDER 28 U.S.C. § 2254**

Joel B. Rudin
Jacob Loup
Law Offices of Joel B. Rudin, P.C.
Carnegie Hall Tower
152 West 57th Street, 8th Floor
New York, New York 10019
(212) 752-7600
(212) 980-2968 (fax)
jloup@rudinlaw.com

*Attorneys for Petitioner William Gay*

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................................................. iii

INTRODUCTION ................................................................................................................... 1

ARGUMENT ........................................................................................................................... 2

    POINT I

    Not even trying to refute our showing that Telena Simmons's testimony
    tended to exculpate William Gay, Respondent fails to show that a rational jury
    could have found Gay guilty beyond a reasonable doubt. .................................................... 2

    POINT II

    Respondent completely ignores the patent suggestiveness of the identification
    procedures that allowed Andrew Brown to deduce that William Gay was the
    police suspect, and Respondent cannot show that Brown's identification
    testimony was reliable despite that extreme suggestiveness................................................ 8

    A.    Like the state courts before it, Respondent fails to address—let alone
         refute—our showing that the pretrial identification procedures used
         here were extraordinarily suggestive because they enabled Andrew
         Brown to deduce that William Gay was the police suspect. ................................... 8

    B.    Respondent, agreeing that this Court must review the *Biggers* factors
         *de novo*, does not rebut our showing that the factors decisively favor
         Gay and that Brown's in-court identification thus was unreliable. ...................... 10

    POINT III

    Contrary to Respondent's memorandum, the pre-lineup information known to
    police did *not* support probable cause to arrest William Gay, and the failure of
    his lawyers to move to suppress the lineup identification on Fourth
    Amendment grounds, along with other failures before and during the trial,
    deprived Gay of the effective representation of counsel. .................................................. 13

CONCLUSION ..................................................................................................................... 15

# TABLE OF AUTHORITIES

**Cases**

*Foster v. California*,
    394 U.S. 440 (1969) ........................................................................................................... 8

*Fuentes v. Griffin*,
    829 F.3d 233 (2d Cir. 2016) ............................................................................................... 2

*Garlick v. Lee*,
    1 F.4th 122 (2d Cir. 2021) .................................................................................................. 2

*Green v. Connell*,
    No. 05-cv-5795, 2006 WL 3388656 (E.D.N.Y. Nov. 21, 2006) ...................................... 10

*Harrington v. Richter*,
    562 U.S. 86 (2011) ............................................................................................................. 2

*Jackson v. Virginia*,
    443 U.S. 307 (1979) ........................................................................................................... 7

*Jimenez v. Graham*,
    No. 11-CV-6468, 2022 WL 2789217 (S.D.N.Y. July 15, 2022) ....................................... 2

*Langston v. Smith*,
    630 F.3d 310 (2d Cir. 2011) ........................................................................................... 5, 7

*Lynch v. Dolce*,
    789 F.3d 303 (2d Cir. 2015) ............................................................................................... 2

*Manson v. Brathwaite*,
    432 U.S. 98 (1977) ........................................................................................................... 11

*Orlando v. Nassau Cnty. Dist. Attorney's Off.*,
    915 F.3d 113 (2d Cir. 2019) ............................................................................................... 2

*Ragunauth v. Ercole*,
    No. 07-cv-1692, 2008 WL 5401586 (E.D.N.Y. Dec. 23, 2008) ........................................ 9

*Raheem v. Kelly*,
    257 F.3d 122 (2d Cir. 2001) ............................................................................................. 11

*Reddy v. Coombe*,
    846 F.2d 866 (2d Cir. 1988) ............................................................................................... 7

*Scrimo v. Lee*,
    935 F.3d 103 (2d Cir. 2019) ............................................................................................... 2

*Simmons v. United States*,
   390 U.S. 377 (1968) ............................................................................................................. 9

*Taylor v. Kuhlmann*,
   36 F. Supp. 2d 534 (E.D.N.Y. 1999) .................................................................................. 10

*United States v. Anderson*,
   747 F.3d 51 (2d Cir. 2014) ................................................................................................... 7

*United States v. Klein*,
   913 F.3d 73 (2d Cir. 2019) ................................................................................................... 7

*United States v. Lorenzo*,
   534 F.3d 153 (2d Cir. 2008) ................................................................................................. 7

*United States v. Pabon*,
   871 F.3d 164 (2d Cir. 2017) ............................................................................................... 15

*United States v. Quattrone*,
   441. F.3d 153 (2d Cir 2006) ................................................................................................. 7

*Walczyk v. Rio*,
   496 F.3d 139 (2d Cir. 2007) ............................................................................................... 14

*Wilson v. Sellers*,
   584 U.S. 122 (2018) ........................................................................................................... 10

*Young v. Collado*,
   No. 20-cv-2172, 2024 WL 3218839 (E.D.N.Y. June 28, 2024) ......................................... 10

*Young v. Conway*,
   698 F.3d 69 (2d Cir. 2012) ........................................................................................ 2, 8, 12

*Young v. Conway*,
   715 F.3d 79 (2d Cir. 2012) ................................................................................................... 2

## INTRODUCTION

It is astonishing and troubling that the Bronx County District Attorney's office would so staunchly defend this murder conviction and life sentence while so thoroughly ignoring the strong evidence that William Gay is innocent and was unlawfully convicted. In our opening papers, we carefully showed how the trial testimony of a key prosecution witness, Telena Simmons, tended to exculpate Gay, because Simmons was face to face with Gay when Glenn Terrell was shot but didn't see Gay shoot Terrell. Respondent agrees with the essential facts underlying this argument. Respondent does not dispute that if Gay were the shooter, he would have had to fire the gun directly in front of Simmons. Respondent agrees that Simmons *did not see Gay shoot Terrell*. Yet nowhere in its memorandum does Respondent even try to spell out any reasoning that could lead a rational jury to convict Gay in the face of such exculpatory evidence. It simply ignores the significance of this evidence, just as the state court did below.

Instead, Respondent resorts to misrepresentation and impermissible speculation to beef up a record that falls far short of proving Gay's guilt. Contending that Gay had a motive to kill Terrell—his supposed anger that Terrell had propositioned Simmons a second or two before the gunshot was heard—Respondent claims in the opening lines of its memorandum that Terrell "jeered at" Gay just before the shooting, directly provoking him. But this is a total fiction; it has no support in the trial record. Claiming that Gay evaded the police after the shooting, Respondent writes that a warrant squad detective "knocked on the doors" at Gay's home. But again, this is made up; there was no such testimony. Asserting that the location of a recovered shell casing proved Gay's guilt, Respondent nowhere acknowledges the testimony of the prosecution's own expert that he "could drop that casing ten times and it could land [in] different spots every time," proving the shell's location to be irrelevant.

As we discuss in more detail below, Respondent takes a similar approach in its other arguments about the supposed sufficiency of the evidence against Gay and in its responses to our other claims for relief. Again and again, Respondent misrepresents the record or completely ignores those parts of the record, carefully cited in our opening memorandum, that contradict its arguments. If there were compelling responses to our arguments based on the actual evidence, Respondent would have made them. Its failure to meaningfully grapple with the many deeply disturbing aspects of this case, as William Gay marks his 17th year in prison, shows just how indefensible this conviction really is. AEDPA's standard of review is demanding but not insurmountable, and this is a case where the state courts' decisions are so lacking in justification that relief is warranted.[1] The Court should grant Gay's petition.

## ARGUMENT

### POINT I

**Not even trying to refute our showing that Telena Simmons's testimony tended to exculpate William Gay, Respondent fails to show that a rational jury could have found Gay guilty beyond a reasonable doubt.**

In our opening memorandum, we showed that the testimony of key prosecution witness Telena Simmons, considered alone, made it impossible for a jury to rationally infer beyond a

---

[1] While AEDPA bars relief if "fairminded jurists could disagree on the correctness of the state court's decision," *Harrington v. Richter*, 562 U.S. 86, 101 (2011) (internal quotation marks omitted); *see* Resp. Mem. 24, habeas corpus review, "by its nature, requires federal courts to, in the appropriate case, disagree with state judges on matters of federal law," *Young v. Conway*, 715 F.3d 79, 85 (2d Cir. 2013) (Parker, J., concurring in the denial of rehearing en banc). Thus, even after *Richter*, courts in this Circuit have granted numerous petitions under AEDPA, including where there was pronounced disagreement among multiple judges, state and federal, about the right outcome. *See, e.g., Fuentes v. Griffin*, 829 F.3d 233 (2d Cir. 2016) (New York Court of Appeals affirmed conviction by 5-2 decision, district court denied a certificate of appealability, and one member of Second Circuit panel dissented); *Scrimo v. Lee*, 935 F.3d 103 (2d Cir. 2019) (district court denied certificate of appealability); *Lynch v. Dolce*, 789 F.3d 303 (2d Cir. 2015) (same); *see also Garlick v. Lee*, 1 F.4th 122 (2d Cir. 2021); *Orlando v. Nassau Cnty. Dist. Attorney's Off.*, 915 F.3d 113 (2d Cir. 2019); *Young v. Conway*, 698 F.3d 69 (2d Cir. 2012); *Jimenez v. Graham*, No. 11-CV-6468, 2022 WL 2789217 (S.D.N.Y. July 15, 2022) (Oetken, J.).

reasonable doubt that Gay was the shooter. *See* Pet.'s Mem. of Law dated Aug. 26, 2024, Doc. 2 ("Opening Mem."), at 22-25. Respondent agrees with all the essential facts underlying this argument. Simmons "stood in the doorway of the bar" while Terrell "exited and stood just outside," "to the left of Simmons," facing her. Resp.'s Mem. of Law dated Jan. 8, 2025, Doc. 14 ("Resp. Mem."), at 6. Simmons encountered Gay to her "right" and greeted him with a kiss. *Id.* Terrell told Simmons she was "going home with" Terrell. *Id.* at 7. While Simmons still "was close to" Gay, the two "having just kissed," Simmons "turned to Terrell" in response to his comment, and she "[s]uddenly" heard a pop—the gunshot that felled Terrell. *Id.* As Respondent observes, Debra Davis's trial testimony "corroborated Simmons' version of events." *Id.* at 27. Davis testified that "[i]t wasn't even five seconds" after Terrell left the bar that Davis heard a gunshot. A.390. That is consistent with Simmons having time only to greet Gay and start turning her head toward Terrell before the gunshot occurred.[2]

But Respondent never grapples with the upshot of these undisputed facts: if Simmons was turning her head from Gay to Terrell when the gun went off, there is no way that *Gay* could have shot Terrell without Simmons seeing it, because Gay would have had to fire the gun directly in front of Simmons, and *Simmons didn't see anything.* She initially thought the pop she heard was a firecracker. *See* Opening Mem. 3. Thus, the set of facts that Respondent agrees with does not support a rational inference beyond a reasonable doubt that Gay shot Terrell. To the contrary, those facts strongly suggest that Gay was *not* the shooter.

---

[2] Respondent at one point writes, ambiguously, that "Terrell's body was lying to the left of the doorway if one were facing the bar's exit," citing pages 267-68 of the trial transcript (A.520-21 of Petitioner's Appendix). Resp. Mem. 8. To be clear, at the cited transcript pages, the prosecutor indicated that Brown, apparently looking at a photograph in evidence, placed Terrell's body to the left of the door from the perspective of a person leaving the bar. This is the same place where Respondent agrees Terrell was standing before the gunshot was fired—i.e., to the left of Simmons as Simmons stood in the bar's doorway, facing the street.

3

Remarkably, Respondent nowhere even tries to refute the logic of the argument we have made about the exculpatory significance of Simmons's testimony. Respondent does not dispute that Gay could have shot Terrell only by firing the gun in front of Simmons. Respondent does not attempt to explain how, if Gay fired the gun in front of Simmons, Simmons could have failed to perceive it. Respondent simply doesn't address our argument at all. That Respondent is unable to come up with any rational explanation for how Simmons's testimony could possibly be consistent with Gay's guilt shows that the guilty verdict did not meet the *Jackson* standard.

Instead of addressing the key argument underlying our insufficiency claim, Respondent claims that a few other categories of evidence connect Gay circumstantially to the shooting. But Respondent repeatedly misrepresents the material facts. None of the *actual* evidence supports a rational inference that Gay shot Terrell.

First, Respondent focuses heavily on Gay's alleged "motive" for killing Terrell: "jealousy" that "Simmons was planning to go home with Terrell." Resp. Mem. 27. But the "evidence" Respondent cites either doesn't exist or doesn't support this theory. In its opening paragraph, setting the tone of the rest of its arguments, Respondent claims, without citation, that Terrell directly provoked Gay just before the shooting: Terrell "jeered at petitioner, boasting that Simmons was going home with him." *Id.* at 2. *But this is completely made up.* There was no evidence at trial that Terrell directed any comment or gesture toward Gay. For the same reason, the record does not support Respondent's assertion that Gay "was competing with the victim for [Simmons]'s affections." *Id.* at 22. There is no evidence that Terrell or Gay ever interacted at all, let alone that they were "competing" with each other.

Respondent asserts that Gay "was plainly unhappy" that "Simmons was planning to go home with Terrell." *Id.* at 26. But this too is pulled out of thin air. Even if, viewing the evidence

4

most favorably to Respondent, one assumes that Gay heard Terrell proposition Simmons, there was no evidence that Gay believed Simmons "was planning to" leave with Terrell. To the contrary, Simmons never testified that she responded to Terrell's proposition. Indeed, her testimony that Terrell was shot almost immediately after he propositioned her implies that she never got a chance to respond. And there was no evidence that Gay "was plainly unhappy" about anything; there was no testimony about what Gay may have said or done or felt in the second or two between Terrell propositioning Simmons and the gunshot being heard.

Moreover, nothing beyond impermissible rank speculation suggests that Gay had the kind of "history with Simmons," *id.*, that would have caused him to murder someone for showing interest in her. Simmons's testimony was that she "hung out" once with Gay after the bar closed and "didn't have a relationship" with him, and he never asked to spend time with her again. Opening Mem. 9. She never testified that she had a sexual or intimate encounter with Gay. Contrary to the prosecutor's claim, she never testified that she "spent the night" with Gay, *see* A.253, 605; "hung out" was the only phrase she used. Respondent's theory of motive requires one to infer that Gay was so inflamed upon hearing Terrell proposition a bartender whom Gay had "hung out" with once after closing time that Gay shot Terrell point blank in the head, virtually instantaneously, without even confronting him first. This is precisely the kind of "speculation and surmise" that is insufficient to support an inference of guilt beyond a reasonable doubt. Opening Mem. 21 (quoting *Langston v. Smith*, 630 F.3d 310, 314 (2d Cir. 2011)).

Turning to the supposed evidence of Gay's consciousness of guilt, Respondent summarily asserts that "police could not find petitioner for several days after the shooting, evidencing his consciousness of guilt." Resp. Mem. 27. But Respondent nowhere acknowledges the trial court's own conclusion that, in fact, the trial testimony "doesn't really create the

inference" that Gay was evading police. A.481; *see* Opening Mem. 14-15, 24. And contrary to Respondent's misstatement of the facts, the warrant squad detective did not claim to have "knocked on the doors" of any homes, Resp. Mem. 10; there was no such testimony.

Respondent contends that the recovered shell casing proves Gay's guilt because the prosecution's expert, Det. Fox, testified that the casing was found in a location "consistent with [Gay] standing" where Simmons placed him in front of the bar. *Id.* at 27. But again, Respondent simply ignores testimony that proved this evidence meaningless: Det. Fox's concession on cross-examination that, because a shell casing falling to a sidewalk in a crowded area will invariably bounce, roll, or be kicked, one "could drop that casing ten times and *it could land [in] different spots every time*." A.363 (emphasis added); *see* Opening Mem. 13, 23-24. Based on this testimony, no juror could rationally conclude beyond a reasonable doubt from the shell-casing evidence that Gay was the shooter.

Finally, Respondent briefly mentions Andrew Brown's testimony that he "saw petitioner standing over Terrell's body with a black object," which Respondent claims was "obviously the murder weapon," Resp. Mem. 26, and "undoubtedly was the smoking gun," *id.* at 27. But that is far from obvious—indeed, it is pure speculation. Squarely asked, "could you tell what it was in [the person's] hand," Brown answered no, claiming he couldn't identify the object because of his shock and fear (which of course also would have affected his ability to accurately remember the face of the person he saw). A.521-22. Brown merely saw a man stand over a fallen gunshot victim for a brief moment, holding an unidentified object that could easily have been a cellphone, wallet, glove, etc. Anyone else standing near Terrell when he was shot could easily have reacted similarly. Indeed, *Simmons did*: she testified that she looked down at Terrell's fallen

6

body and momentarily stood there "because [she] was in shock." A.316. By Respondent's logic, that means Simmons must have been the shooter. But Respondent doesn't argue that.

In sum, Respondent's theory of guilt relies on misrepresentation and impermissible leaps of logic that do not rationally support a finding of guilt beyond a reasonable doubt. Respondent cites language from a 1988 Second Circuit case that a court reviewing an insufficiency claim "must credit every inference that could have been drawn in the State's favor." Resp. Mem. 25 (quoting *Reddy v. Coombe*, 846 F.2d 866, 869 (2d Cir. 1988)). But the inferences that "could have been drawn" must be *reasonable*; "specious inferences are not indulged." *United States v. Klein*, 913 F.3d 73, 78 (2d Cir. 2019) (quoting *United States v. Lorenzo*, 534 F.3d 153, 159 (2d Cir. 2008)). While this Court must view the evidence "'in the light most favorable to the prosecution,'" it "cannot 'credit inferences within the realm of possibility when those inferences are unreasonable.'" *Langston*, 630 F.3d at 314 (quoting *Jackson v. Virginia*, 443 U.S. 307, 319 (1979); then *United States v. Quattrone*, 441. F.3d 153, 169 (2d Cir 2006)). Ultimately, "if the evidence viewed in the light most favorable to the prosecution gives equal or nearly equal circumstantial support to a theory of guilt and a theory of innocence, then a reasonable jury must necessarily entertain a reasonable doubt." *United States v. Anderson*, 747 F.3d 51, 60 (2d Cir. 2014) (quoting *Lorenzo*, 534 F.3d at 159).

Here, Simmons's testimony points to Gay's innocence, and even if it didn't, nothing beyond rank speculation leads to an inference from any of the rest of the evidence that Gay shot Terrell. No rational jury could have believed beyond a reasonable doubt that Gay was guilty. Gay's jury likely convicted him only because it was unfairly swayed to do so by the misconduct and errors of the prosecutor and defense attorney. *See* Opening Mem. 24, 39-48. This Court should correct this miscarriage of justice and grant the writ.

# POINT II

**Respondent completely ignores the patent suggestiveness of the identification procedures that allowed Andrew Brown to deduce that William Gay was the police suspect, and Respondent cannot show that Brown's identification testimony was reliable despite that extreme suggestiveness.**

A. **Like the state courts before it, Respondent fails to address—let alone refute—our showing that the pretrial identification procedures used here were extraordinarily suggestive because they enabled Andrew Brown to deduce that William Gay was the police suspect.**

Our opening memorandum cited Second Circuit precedent, scientific research discussed in those judicial decisions, and additional follow-up research by leading eyewitness-identification experts—all showing that the "mugshot exposure" that Andrew Brown experienced in this case is highly suggestive and creates a strong likelihood of misidentification. *See* Opening Mem. 27-28. When, like Brown, a "witness initially makes no identification from a photo array, but then selects someone whose picture was included in the photo array during a later identification procedure," *Young v. Conway*, 698 F.3d 69, 82 (2d Cir. 2012), the risk of misidentification is high, because it has been made "clear to the witness which person the police suspect of having committed the crime," A.1201. Under such circumstances, it was "all but inevitable that [Brown] would identify [Gay] whether or not he was in fact 'the man.'" *Foster v. California*, 394 U.S. 440, 443 (1969). It is hard to fathom a logical argument that this manner of soliciting an eyewitness identification is not unduly suggestive.

Perhaps that is why Respondent does not hazard such an argument. Respondent never acknowledges any of the Second Circuit case law or scientific research we presented, and it makes no effort to explain how a procedure that enables an eyewitness to deduce the police suspect's identity could *not* be unduly suggestive. Respondent contends only that Brown's lineup

8

identification could not have resulted from undue suggestion because "the photo arrays shown to Brown prior to the lineup were not themselves unduly suggestive." Resp. Mem. 36.

But that argument is illogical. If a witness views a perfectly composed photo array containing the accused and makes no identification, and the witness then views a perfectly composed in-person lineup containing the accused but different fillers, it will still be readily apparent to the witness that the single person common to both procedures must be the police suspect. The non-suggestiveness of the photo array itself does nothing to prevent the witness from deducing the suspect's identity.

The handful of cases Respondent cites, *see id.* at 35-36, are inapposite, because the witnesses in those cases, unlike Andrew Brown, all keyed in on the police suspect at the *first* identification procedure, suggesting they truly recognized him as the perpetrator. In *Simmons v. United States*, 390 U.S. 377 (1968), five witnesses identified the accused from snapshots in which other people also appeared. *See id.* at 382. The Supreme Court simply held that these pretrial photographic identifications were not so suggestive as to preclude an in-court identification. *Id.* at 385. *Simmons* says nothing about a situation like the present one, where the witness did *not* identify the suspect upon seeing his photograph, but instead identified the suspect only after twice *failing* to identify him in photographs and then being shown a lineup containing the same suspect and five different fillers, thus allowing the witness to deduce the suspect's identity before he ever claimed to recognize the suspect.

The handful of district court cases Respondent cites are similarly irrelevant because the witnesses focused on the suspect from the start. *See Ragunauth v. Ercole*, No. 07-cv-1692, 2008 WL 5401586, at *1-2 (E.D.N.Y. Dec. 23, 2008) (witness Dulasky, shown photo array, said he "believe[d]" accused was the robber, then positively identified accused in second array and

lineup); *Green v. Connell*, No. 05-cv-5795, 2006 WL 3388656, at *2 (E.D.N.Y. Nov. 21, 2006) (witness "narrowed his selection to two photos," including that of accused, then identified accused in lineup); *Taylor v. Kuhlmann*, 36 F. Supp. 2d 534, 539 (E.D.N.Y. 1999) (witness shown photo array identified accused as robber then identified him again in lineup).

Invoking AEDPA's deferential standard of review, Respondent asserts that "[t]he state court appropriately rejected th[e] argument" that "Brown's lineup identification was tainted by his earlier viewing of two photo arrays." Resp. Mem. 35. But the state courts did *not* reject that argument; as we have shown, they never considered it. *See* Opening Mem. 8, 29. Respondent does not point to any part of the record that shows otherwise. This Court must "review[] the specific reasons given by the state court" for denying Gay's suppression motion. *See id.* at 19 (quoting *Young v. Collado*, No. 20-cv-2172, 2024 WL 3218839, at *8 (E.D.N.Y. June 28, 2024) (Chin, Circuit Judge)); *Wilson v. Sellers*, 584 U.S. 122, 125 (2018). No state-court decision that failed to consider the extraordinary suggestiveness of procedures that enabled a witness to deduce the identity of the police suspect can be deemed a reasonable application of the due process principles governing eyewitness identifications.

**B.**     **Respondent, agreeing that this Court must review the *Biggers* factors *de novo*, does not rebut our showing that the factors decisively favor Gay and that Brown's in-court identification thus was unreliable.**

Although Respondent for some reason calls "inapt" our argument that this Court must review the *Biggers* factors *de novo*, Resp. Mem. 38, its memorandum ultimately makes clear that it agrees with us. As Respondent correctly writes, a federal court is not "always obliged to analyze [the *Biggers* factors] *de novo*" but it must do so if it first makes "the p[rere]quisite finding that the lineup procedure at issue was unduly suggestive," and if the state courts didn't conduct the *Biggers* analysis. *Id.* Such is the case here. *See* Opening Mem. 29.

10

Turning to the merits, Respondent offers nothing to show that Brown could make an "independently reliable" in-court identification despite the extreme suggestiveness of the out-of-court identification procedures. How could Brown's recollection of the man he saw standing over Terrell possibly be "[un]distorted," *Raheem v. Kelly*, 257 F.3d 122, 140 (2d Cir. 2001) (alteration in *Raheem*) (quoting *Manson v. Brathwaite*, 432 U.S. 98, 112 (1977)), when Brown did not claim to recognize Gay until after he was able to deduce that Gay was the police suspect; then signed a Line-Up Report explicitly confirming for him that Gay was the "Suspect"; then, a day before his in-court identification was to be elicited, was shown a photograph of the lineup to refresh memory of Gay's appearance? *See* Opening Mem. 29-30. Respondent has no answer.

Nor does Respondent rebut our showing that the enumerated *Biggers* factors decisively favor Gay. *See id.* at 30-32. Starting with the conditions of Brown's observation of the man standing over Terrell (factors one and two), Respondent says only that Brown had an "unobstructed" view. Resp. Mem. 39. Respondent never addresses our showing that Brown's observation was brief and fleeting, and impaired by his fear and shock, his alcohol consumption, his hunger (he was on a 4:00 a.m. mission to sell personal property to buy food, *see* A.515), his focus on the object in the man's hand (which, however, he still couldn't recognize), the obscuring effect of the man's hat, and the poor nighttime lighting. *See* Opening Mem. 30-31.

Respondent contends that Brown's description of the man he saw was similar to Simmons's description of Gay and Gay's actual appearance (factor three), but Respondent then acknowledges that the man Brown saw was wearing a Yankees baseball cap, while Simmons saw Gay wearing a "fitted skully cap" or "knit hat." Resp. Mem. 39; *see* Opening Mem. 31. Respondent minimizes this discrepancy as a "normal variation[] to be expected given that memory is not photographic." Resp. Mem. 39. But if anything was likely to reliably stick in

11

Brown's and Simmons's memories, it was a distinct, recognizable detail like the New York Yankees logo—which Brown saw and Simmons didn't. Moreover, if Respondent believes that Brown was mistaken about seeing a conspicuous, coarse feature like the Yankees logo because "memory is not photographic," then how can Respondent argue that Brown's supposed memory of Gay's face, requiring subtler powers of recognition, had any reliability? On top of all this, Simmons's testimony that when she momentarily stood looking at Terrell's fallen body after the shooting, Gay was *not* "still standing right there," A.317, further indicates that the person Brown saw standing over Terrell was someone other than Gay.

Finally, Respondent's assertion that "the details of the incident were still fresh in Brown's mind" when he viewed the lineup "only eleven days after the shooting" (the fifth factor), Resp. Mem. 40, is contradicted by scientific evidence relied on by the Second Circuit, and cited in our opening papers, that memory degrades quickly, such that even a delay of one week dramatically reduces the reliability of an identification, *see* Opening Mem. 31-32 (citing *Young*, 698 F.3d at 84). Respondent just ignores this judicial and scientific precedent.

In sum, the record decisively establishes that Brown could not make an independently reliable in-court identification of Gay and that the pretrial procedures used on Brown created a very substantial likelihood of irreparable misidentification. Because there is no question— indeed, Respondent nowhere disputes—that the improperly admitted identification testimony "had a substantial and injurious effect or influence in determining the jury's verdict," the petition should be granted. *Id.* at 32 (quoting *Young*, 698 F.3d at 87).

# POINT III

**Contrary to Respondent's memorandum, the pre-lineup information known to police did *not* support probable cause to arrest William Gay, and the failure of his lawyers to move to suppress the lineup identification on Fourth Amendment grounds, along with other failures before and during the trial, deprived Gay of the effective assistance of counsel.**

In response to our ineffectiveness claim, Respondent mostly reiterates the reasoning of the state courts that we already have shown to be unreasonable. *See* Opening Mem. 39-47. However, in arguing that counsel was not ineffective for failing to move to suppress the identification testimony on Fourth Amendment grounds, because the police supposedly had probable cause to arrest William Gay, Respondent again relies on multiple omissions and misrepresentations of the record that must be corrected.

Respondent contends that probable cause to arrest Gay before the lineup arose from three sets of facts: (1) Simmons "identified petitioner's motive, noting that she had previously spent the night with petitioner"; (2) Simmons told police that when she greeted Gay with a kiss, "no one else was in the vicinity," and "she immediately heard a shot and then saw Terrell lying on the ground"; and (3) Andrew Brown told police that "he saw a man matching petitioner's general description . . . standing over the victim while brandishing a dark object." Resp Mem. 45-46. Respondent is wrong.

First, Simmons never "identified petitioner's motive." The only place where Simmons has ever said anything about Gay's alleged motive was in a post-conviction affidavit in which she *rejected* Respondent's theory of motive, writing: "I do not think that Dirty [i.e., Terrell] was shot in a dispute over me," and that theory "did not make any sense because I was not in a relationship with Gay." A.851. Nor does the suppression-hearing record (or the trial record, *see* pp. 4-5, *supra*) support an inference of such a motive. According to the detective's hearing

13

testimony, Simmons knew Gay as "Boo" and knew that Gay was friends with a "guy she really call[ed] Boo." A.31. Gay lived with this "real" Boo. A.105. A couple weeks before the shooting, Simmons "spent the night with Boo, *and the defendant was there also*." A.108 (emphasis added); *accord* A.110 ("[T]here was a house . . . where she had spent the night, *and the defendant was in there*." (emphasis added)). These statements suggest that on the one occasion when Simmons socialized with Gay, she was principally involved with Gay's roommate "Boo," not Gay. Respondent's assertion that Simmons claimed to have "spent the night" with Gay implies a sexual or intimate encounter that Simmons's actual statements (at least as conveyed by the detective) do not imply. Moreover, even if Simmons *had* had a one-night intimate encounter with Gay weeks before the shooting, that alone would not make it probable that Gay had shot Terrell. No reasonable police officer could muster more than a "mere suspicion" of Gay's guilt—if even that—based on the evidence of motive that Respondent invokes. *Walczyk v. Rio*, 496 F.3d 139, 156 (2d Cir. 2007) (internal quotation marks omitted).

Next, Respondent inaccurately claims that Simmons reported that "no one else was in the vicinity" other than Gay when Terrell was shot, which would imply that Gay was the only possible shooter. The detective's actual hearing testimony was that Simmons said Gay was "the only person that she had seen standing by [Terrell]," A.31, or "the closest person" to Terrell before the gunshot, A.36—implying other people also were outside the bar at this time when it was "closing," A.43-44. (The trial testimony was that the area was "crowded," A.547, with multiple people "coming out" of the bar, A.520.) If anything, the proximity among Simmons, Gay, and Terrell reinforces our point that Simmons had to have seen Gay shoot Terrell if that's how it happened. But here again, in the probable-cause context, Respondent simply ignores that inconvenient argument that Simmons must have seen the shooting if Gay had done it.

14

Finally, Andrew Brown's observation of a man standing over the fallen Terrell could not give rise to probable cause, because before Gay was arrested and put in a lineup, *Brown had twice failed to identify Gay as the man he had seen*, suggesting Gay was *not* that man. Respondent completely ignores these highly exculpatory non-identifications. Further, the man Brown saw was wearing a Yankees cap, not the knit skull cap that Simmons had seen Gay wearing, making Brown's pre-lineup statements *doubly* exculpatory. Even if Respondent were right that Brown's utterly generic "general description" of the man he saw was consistent with Gay, Resp. Mem. 46—it wasn't, as Gay was substantially heavier and younger than the man Brown described, *see* Opening Mem. 31—that could not possibly have given rise to probable cause in light of Brown's highly exculpatory non-identifications of Gay and observation of the Yankees hat.

"[O]fficers may not disregard facts tending to dissipate probable cause," *United States v. Pabon*, 871 F.3d 164, 175 (2d Cir. 2017) (internal quotation marks omitted), but that is precisely what Respondent does in ignoring the exculpatory significance of Simmons's and Brown's statements. Any competent lawyer would have recognized the lack of probable cause and made the meritorious Fourth Amendment motion to preclude the identifications. The failure of Gay's lawyers to make that motion and get Brown's identification suppressed, considered alone or cumulatively with the other errors detailed in our opening memorandum, severely prejudiced Gay and therefore deprived him of the effective assistance of counsel.

## CONCLUSION

The clear inference from the testimony of prosecution witness Simmons was that William Gay could not have been the shooter. Neither the District Attorney's Office nor the state courts have ever offered any plausible interpretation of Simmons's testimony that avoids that

15

exculpatory inference. The prosecution's other evidence shows—at most—nothing more than that Gay, just like Simmons next to him, momentarily looked down at Terrell's fallen body before leaving the area. It is appalling to condemn a young man to prison for the rest of his life on this record. And *this* record is what this Court must consider—not the would-be record that Respondent tries to manifest through misrepresentation and rank speculation. This Court should grant William Gay's habeas corpus petition and order his release from custody, or at least order a hearing.

/s/
Jacob Loup
Law Offices of Joel B. Rudin, P.C.
Carnegie Hall Tower
152 West 57th Street, 8th Floor
New York, New York 10019
(212) 752-7600 (phone)
(212) 980-2968 (fax)
jloup@rudinlaw.com

*Attorney for Petitioner William Gay*

Dated:   New York, New York
         February 25, 2025

16