UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

|  |  |
|---|---|
| WILLIAM GAY,<br><br>        Petitioner,<br><br>  v.<br><br>MARK MILLER, Superintendent of Green Haven Correctional Facility,[1]<br><br>        Respondent. | No. 24-cv-6424 (JLR) (RFT) |

**PETITIONER WILLIAM GAY'S RULE 72 OBJECTIONS
TO THE REPORT & RECOMMENDATION OF
MAGISTRATE JUDGE ROBYN F. TARNOFSKY (ECF 20)**

Joel B. Rudin
Jacob Loup
Law Offices of Joel B. Rudin, P.C.
Carnegie Hall Tower
152 West 57th Street, 8th Floor
New York, New York 10019
(212) 752-7600
(212) 980-2968 (fax)
jloup@rudinlaw.com

*Attorneys for Petitioner William Gay*

---

[1] When Petitioner filed his habeas corpus petition, he was imprisoned at Eastern Correctional Facility. He is now imprisoned at Green Haven Correctional Facility, under Superintendent Mark Miller. Mr. Miller is "automatically substituted" as the respondent. Fed. R. Civ. P. 25(d); *accord Anderson v. Lempke*, No. 11-CV-8240 NSR PED, 2015 WL 4104605, n.1 (S.D.N.Y. July 6, 2015).

**TABLE OF CONTENTS**

TABLE OF AUTHORITIES ................................................................................................ vi

INTRODUCTION .............................................................................................................. 1

RELEVANT FACTUAL AND PROCEDURAL BACKGROUND ............................................. 3

      A.     Glenn Terrell is fatally shot next to Telena Simmons, whose observations suggest that Petitioner William Gay could not have been the shooter. ................. 3

      B.     Andrew Brown claims he saw a man briefly standing over the fallen victim and twice fails to identify Gay as that man. ............................................................. 5

      C.     Despite Simmons's statements exculpating Gay and Brown's repeated failure to identify Gay, police arrest Gay and put him in a lineup, where Brown, able to deduce that Gay is the police suspect, now identifies Gay. ........... 7

      D.     Gay's lawyers do not seek to suppress Brown's identification on Fourth Amendment grounds, and the court denies Gay's motion to suppress based on unduly suggestive police procedures. ............................................................... 8

      E.     The trial ....................................................................................................... 9

            1.     Telena Simmons and Debra Davis give testimony strongly suggesting Gay could not have been the shooter. ..................................... 9

            2.     Andrew Brown testifies that, after consuming at least five alcoholic drinks, he heard a gunshot and saw a man in a Yankees cap standing over the fallen victim. ........................................................... 10

            3.     Other witnesses ..................................................................................... 12

            4.     Summations, jury charge, verdict, and sentencing .................................. 14

      F.     Post-trial investigation and N.Y. C.P.L. § 440.10 motion ................................... 15

      G.     The Appellate Division affirms Gay's conviction, the New York Court of Appeals denies leave to appeal, and this timely petition follows. ........................ 16

      H.     Magistrate Judge Tarnofsky issues a Report & Recommendation recommending the Court deny Gay's petition. .................................................... 16

STANDARD OF REVIEW ................................................................................................ 17

ARGUMENT ...................................................................................................................... 18

POINT I

Particularly in light of Telena Simmons's testimony that she stood face to face with William Gay but did not see him shoot Glenn Terrell, no rational juror could eliminate all reasonable doubt about Gay's guilt, and the R&R erroneously relies on highly speculative inferences to find otherwise. .......................................................... 18

    A.    *Jackson v. Virginia* forbids conviction based on inferences that are merely "permissible" or "within the realm of possibility" but not "sufficiently supported" to establish guilt beyond a reasonable doubt. .................................... 18

    B.    The R&R errs by making multiple inferential leaps that are not sufficiently supported by the circumstantial evidence to establish guilt beyond a reasonable doubt. ............................................................................................... 20

POINT II

Where Andrew Brown twice failed to identify William Gay in photo arrays, then saw Gay in a lineup with different fillers, thus revealing that Gay must be the police suspect, Brown's identification resulted from undue suggestion and was unreliable; the R&R erroneously minimizes the massively corrupting effect of these procedures. ............................................................................................................... 26

    A.    Due process prohibits the use of unreliable identifications resulting from undue suggestion. ............................................................................................. 26

    B.    Recent Second Circuit precedent and scientific studies show that identification procedures are unduly suggestive where, as here, a witness does not identify the suspect in a photo array and then is shown a lineup with the same suspect but different fillers. ............................................................ 27

    C.    The identification procedures used here, which allowed Brown to deduce that Gay must be the police suspect, were inherently unduly suggestive. ............ 28

    D.    Brown's lineup and in-court identifications were unreliable, and thus their admission at trial violated due process. ............................................................. 32

    E.    The erroneous admission of Brown's identification was not harmless. ............... 34

POINT III

The R&R erroneously minimizes the errors committed by William Gay's lawyers, which, considered cumulatively, deprived him of the effective assistance of counsel. ........................................................................................................................... 35

A.   Law governing ineffectiveness claims ................................................... 35

B.   Gay's lawyers were ineffective for failing to seek to suppress Brown's
     identification on Fourth Amendment grounds. ...................................... 36

     1.   Counsel may be ineffective under *Strickland* for failing to make a
          meritorious Fourth Amendment suppression motion. ............................ 36

     2.   Gay's lawyers unreasonably failed to pursue the meritorious
          Fourth Amendment suppression issue. ................................................... 37

C.   Counsel committed numerous additional errors at trial that, considered
     collectively, denied Gay reasonably competent representation. ........................... 40

     1.   Failure to correct the court's repeated misstatements, when
          charging the jury, that Brown had identified Gay as "the
          perpetrator" ........................................................................................ 40

     2.   Failure to consult with or call an eyewitness-identification expert .......... 41

     3.   Failure to cross-examine Brown about discrepancies between his
          description of the man he saw and Gay's appearance ............................. 42

     4.   Failure to object to *any* of the prosecutor's improper, highly
          prejudicial remarks in his opening statement and summation ................. 43

     5.   Failure to request a consciousness-of-guilt jury charge........................... 45

     6.   Failure to request an inquiry of the jurors after they reported being
          afraid of Terrell's family........................................................................ 46

D.   Considered cumulatively, counsels' numerous errors prejudiced Gay................. 47

CONCLUSION.................................................................................................. 48

iv

# TABLE OF AUTHORITIES

**Cases**

*Anderson v. Lempke*,
No. 11-CV-8240 NSR PED, 2015 WL 4104605 (S.D.N.Y. July 6, 2015) ............................... i

*Andrew v. White*,
604 U.S. 86 (2025) ................................................................................................. 17, 31

*Bigford v. Taylor*,
834 F.2d 1213 (5th Cir. 1988) ........................................................................................ 37

*Brisco v. Ercole*,
565 F.3d 80 (2d Cir. 2009) ........................................................................................ 26, 33

*Brown v. Davenport*,
596 U.S. 118 (2022) ...................................................................................................... 34

*Coleman v. Johnson*,
566 U.S. 650 (2012) ...................................................................................................... 19

*Dolphy v. Mantello*,
552 F.3d 236 (2d Cir. 2009) ........................................................................................... 17

*Eze v. Senkowski*,
321 F.3d 110 (2d Cir. 2003) ........................................................................................... 35

*Foster v. California*,
394 U.S. 440 (1969) ................................................................................................. 2, 28

*Fuentes v. Griffin*,
829 F.3d 233 (2d Cir. 2016) ........................................................................................... 18

*Gersten v. Senkowski*,
426 F.3d 588 (2d Cir. 2005) ...................................................................................... 35, 41

*Gousse v. Superintendent, Wende Corr. Facility*,
No. 19-CV-1607 (JS), 2020 WL 4369643 (E.D.N.Y. July 29, 2020) .............................. 30, 31

*Greene v. Brown*,
No. 06-CV-5532 (LAP) (GWG), 2007 WL 1589449 (S.D.N.Y. June 4, 2007) ..................... 31

*Haliym v. Mitchell*,
492 F.3d 680 (6th Cir. 2007) ......................................................................................... 34

*Harrington v. Richter*,
562 U.S. 86 (2011) .................................................................................................. 17, 18

*Harris v. Senkowski,*
    298 F. Supp. 2d 320 (E.D.N.Y. 2004) ............................................................ 2, 27, 35, 43

*Henry v. Poole,*
    409 F.3d 48 (2d Cir. 2005).................................................................................................. 36

*Herrera v. Collins,*
    506 U.S. 390 (1993)........................................................................................................... 44

*Hodge v. Hurley,*
    426 F.3d 368 (6th Cir. 2005) ............................................................................................ 43

*Jackson v. Conway,*
    763 F.3d 115 (2d Cir. 2014)............................................................................................... 17

*Jackson v. Virginia,*
    443 U.S. 307 (1979).................................................................... 18, 19, 22, 23, 26, 48

*Jimenez v. Graham,*
    No. 11-CV-6468, 2022 WL 2789217 (S.D.N.Y. July 15, 2022) .......................................... 18

*Jordan v. Lamanna,*
    33 F.4th 144 (2d Cir. 2022) ............................................................................................... 17

*Kimmelman v. Morrison,*
    477 U.S. 365 (1986)........................................................................................................... 36

*Langston v. Smith,*
    630 F.3d 310 (2d Cir. 2011)................................................................................... 18, 19, 20

*Layne v. Kopp,*
    No. 1:21-CV-03989 (JLR), 2025 WL 869716 (S.D.N.Y. Mar. 20, 2025)............................ 17

*Lindstadt v. Keane,*
    239 F.3d 191 (2d Cir. 2001)............................................................................................... 36

*Lynch v. Dolce,*
    789 F.3d 303 (2d Cir. 2015)............................................................................................... 18

*Mallory v. United States,*
    354 U.S. 449 (1957)........................................................................................................... 37

*Manson v. Brathwaite,*
    432 U.S. 98 (1977)....................................................................................................... 27, 32

*Murphy v. Warden of Attica Corr. Facility,*
    No. 20CIV3076PAEGWG, 2022 WL 1145050 (S.D.N.Y. Apr. 19, 2022)................ 40, 41, 43

*Murray v. Carrier*,
477 U.S. 478 (1986) ........................................................................................... 36

*Nambiar v. Cent. Orthopedic Grp., LLP*,
158 F.4th 349 (2d Cir. 2025) ........................................................................... 2, 17

*Neil v. Biggers*,
409 U.S. 188 (1972) .......................................................................... 27, 32-34, 37, 40

*Orlando v. Nassau Cnty. Dist. Attorney's Off.*,
915 F.3d 113 (2d Cir. 2019) ............................................................................... 18

*Ornelas v. United States*,
517 U.S. 690 (1996) ........................................................................................... 36

*People v. Alfaro*,
260 A.D.2d 495 (2d Dep't 1999) ......................................................................... 44

*People v. Ballott*,
20 N.Y.2d 600 (1967) ......................................................................................... 37

*People v. Baum*,
54 A.D.3d 605 (1st Dep't 2008) ......................................................................... 46

*People v. Bennett*,
79 N.Y.2d 464 (1972) ......................................................................................... 23

*People v. Buford*,
69 N.Y.2d 290 (1987) ......................................................................................... 46

*People v. Coke*,
238 A.D.3d 71 (1st Dep't 2025) ......................................................................... 25

*People v. Dukes*,
8 N.Y.3d 952 (2007) ........................................................................................... 46

*People v. Gay*,
211 A.D.3d 589 (1st Dep't 2022) .................................................................... 16, 40

*People v. Kuzdzal*,
31 N.Y.3d 478 (2018) ......................................................................................... 46

*People v. LeGrand*,
8 N.Y.3d 449 (2007) ........................................................................................... 42

*People v. Sanchez*,
99 N.Y.2d 622 (2003) ......................................................................................... 46

*People v. Williams*,
41 N.Y.3d 551 (2024) ........................................................................................ 37

*People v. Wilson*,
295 A.D.2d 272 (1st Dep't 2002) ..................................................................... 46

*Pilotti v. Superintendent, Great Meadow Corr. Facility*,
759 F. Supp. 1031 (S.D.N.Y. 1991)................................................................... 26

*Quartararo v. Fogg*,
679 F. Supp. 212 (E.D.N.Y.) (Korman, J.) .................................................. 43, 45

*Raheem v. Kelly*,
257 F.3d 122 (2d Cir. 2001)................................................. 26, 27, 29, 31, 34

*Rupp v. Buffalo*,
91 F.4th 623 (2d Cir. 2024) .............................................................................. 36

*Scrimo v. Lee*,
935 F.3d 103 (2d Cir. 2019).............................................................................. 18

*Simmons v. United States*,
390 U.S. 377 (1968)..................................................................................... 27, 34

*Spears v. Greiner*,
459 F.3d 200 (2d Cir. 2006).............................................................................. 17

*State v. Henderson*,
208 N.J. 208 (N.J. 2011).................................................................................... 32

*Stermer v. Warren*,
959 F.3d 704 (6th Cir. 2020) ........................................................................... 43

*Strickland v. Washington*,
466 U.S. 668 (1984)........................................................... 15, 35, 36, 41, 47

*Sullivan v. Louisiana*,
508 U.S. 275 (1993)........................................................................................... 19

*United States v. Cassese*,
428 F.3d 92 (2d Cir. 2005)................................................................................ 19

*United States v. Crews*,
445 U.S. 463 (1980)...................................................................................... 36, 37

*United States v. Curley*,
639 F.3d 50 (2d Cir. 2011)................................................................................ 41

*United States v. D'Amato*,
  39 F.3d 1249 (2d Cir. 1994)..................................................................... 19

*United States v. Douglas*,
  525 F.3d 225 (2d Cir. 2008)..................................................................... 27

*United States v. Figueroa*,
  618 F.2d 934 (2d Cir. 1980)..................................................................... 41

*United States v. Friedman*,
  909 F.2d 705 (2d Cir. 1990)..................................................................... 44

*United States v. Glenn*,
  312 F.3d 58 (2d Cir. 2002)................................................................. 20, 23

*United States v. Greene*,
  704 F.3d 298 (4th Cir. 2013) ................................................................... 34

*United States v. Guldi*,
  141 F.4th 435 (2d Cir. 2025) ................................................................... 20

*United States v. Jones*,
  393 F.3d 107 (2d Cir. 2004)................................................................. 19, 20

*United States v. Landesman*,
  17 F.4th 298 (2d Cir. 2021) ..................................................................... 19

*United States v. Lopez*,
  74 F.3d 575 (5th Cir. 1996) ..................................................................... 20

*United States v. Lorenzo*,
  534 F.3d 153 (2d Cir. 2008)..................................................................... 20

*United States v. Mackey*,
  143 F.4th 129 (2d Cir. 2025) ................................................................... 19

*United States v. Martinez*,
  54 F.3d 1040 (2d Cir. 1995)..................................................................... 19

*United States v. Melhuish*,
  6 F.4th 380 (2d Cir. 2021) ................................................................. 36, 41

*United States v. Nolan*,
  956 F.3d 71 (2d Cir. 2020)........................................ 27, 31, 36, 41, 42, 47

*United States v. Pabon*,
  871 F.3d 164 (2d Cir. 2017)..................................................................... 37

*United States v. Persico*,
　645 F.3d 85 (2d Cir. 2011)................................................................................................... 19

*United States v. Quattrone*,
　441. F.3d 153 (2d Cir 2006)................................................................................................ 19

*United States v. Rodriguez*,
　392 F.3d 539 (2d Cir. 2004)................................................................................................ 19

*United States v. Smith*,
　778 F.2d 925 (2d Cir. 1985)................................................................................................ 44

*United States v. Wade*,
　388 U.S. 218 (1967)............................................................................................................ 37

*Walczyk v. Rio*,
　496 F.3d 139 (2d Cir. 2007)................................................................................................ 37

*White v. Woodall*,
　572 U.S. 415 (2014)............................................................................................................ 17

*Williams v. Artuz*,
　237 F.3d 147 (2d Cir. 2001)................................................................................................ 16

*Williams v. Taylor*,
　529 U.S. 362 (2000)............................................................................................................ 17

*Wilson v. Mazzuca*,
　570 F.3d 490 (2d Cir. 2009)................................................................................................ 36

*Wong Sun v. United States*,
　371 U.S. 471 (1963)............................................................................................................ 23

*Young v. Conway*,
　698 F.3d 69 (2d Cir. 2012)................................................................. 18, 27, 28, 31-36, 42

*Young v. Conway*,
　715 F.3d 79 (2d Cir. 2013)................................................................................................ 18

**Statutes**

28 U.S.C. § 2254.............................................................................................................. 1, 17

N.Y. C.P.L. § 440.10 ............................................................................................................ 15

**Rules**

Fed. R. Civ. P. 25 ................................................................................................................ i

Fed. R. Civ. P. 72 ........................................................................................................ 1, 17

**Other Authorities**

Daniel E. Re & Nicholas O. Rule,
*Heavy Matters: The Relationship Between Just Noticeable Differences
in Perceptions of Facial Adiposity and Facial Attractiveness*,
7 Soc. Psych. & Personality Sci. 69 (2015) ............................................................ 33

Gary L. Wells et al.,
*Policy and Procedure Recommendations for the Collection and
Preservation of Eyewitness Identification Evidence*,
44 Law & Hum. Behav. 3 (2020) ............................................................................ 28

John T. Wixted et al.,
*Test a Witness's Memory of a Suspect Only Once*,
22 Psych. Sci. in the Pub. Interest 1S (2021)......................................................... 28

N.Y. Crim. Jury Instructions & Model Colloquies,
"Consciousness of Guilt" (available on Westlaw by searching "CJI2D(NY) GA 10") ......... 23

**INTRODUCTION**

Under Federal Rule of Civil Procedure 72, Petitioner William Gay respectfully objects to the Report & Recommendation of the Honorable Robyn F. Tarnofsky, dated February 9, 2026, which recommends denying Mr. Gay's habeas corpus petition brought under 28 U.S.C. § 2254. *See* ECF 20 ("R&R"). This Court should grant the petition.

The R&R first errs in rejecting Gay's due process claim that the evidence against him, which was entirely circumstantial, was legally insufficient to prove him guilty of murder beyond a reasonable doubt. A main prosecution witness, Telena Simmons, testified she was face to face with Gay on a crowded sidewalk when she heard the fatal gunshot, *but she did not see Gay shoot anyone*. Like the courts before it, the R&R fails to meaningfully grapple with—let alone explain away—the enormous doubt that Simmons's testimony would cause any rational factfinder. As explained below, the R&R then makes multiple inferences from the circumstantial evidence that are far too speculative to show guilt beyond a reasonable doubt. Among such evidence was the testimony of the prosecution's other key eyewitness, Andrew Brown, who also did not see the shooting. His testimony that he heard a gunshot and then saw Gay standing over the victim—the exact same action Simmons testified she took, while in shock, after the victim fell at her feet— could not eliminate all reasonable doubt about Gay's guilt. Brown did not see Gay with a weapon, and Gay's mere presence was insufficient to establish guilt beyond a reasonable doubt.

The R&R also errs in rejecting Gay's claim that Brown's lineup and in-court identifications violated Gay's due process rights and should have been suppressed. Brown *twice* failed to identify Gay in photo arrays as the man he had seen near the victim after the shooting. Only when Brown viewed a lineup featuring Gay and a different set of fillers—and Brown thus was able to deduce that Gay must be the police suspect—did Brown first claim to recognize Gay.

The R&R, like the courts before it, unreasonably brushed aside the extraordinarily corrupting influence of these procedures, which essentially told Brown, "This is the man." *Foster v. California*, 394 U.S. 440, 443 (1969).

Finally, the R&R errs in rejecting Gay's Sixth Amendment ineffectiveness claim. Gay's attorney inexcusably failed to move to suppress Brown's identification, even though police had no probable cause to arrest Gay and put him in the lineup. The main pre-lineup evidence they had was (a) Simmons's statement that she was face to face with Gay but didn't see him shoot anyone and (b) Andrew Brown's repeated failure to recognize Gay in the photo arrays. As elaborated below, the R&R makes unwarranted leaps of logic to find probable cause and thereby excuse counsel's catastrophic error. The R&R then unreasonably minimizes numerous additional damaging errors, detailed below, that Gay's lawyer committed during trial, which likely swayed the jury to convict despite the woefully weak evidence.

This Court, required to review the R&R de novo, *see Nambiar v. Cent. Orthopedic Grp., LLP*, 158 F.4th 349, 360-61 (2d Cir. 2025), should grant William Gay's petition. It may be tempting to assume, because this conviction has survived multiple levels of review, that Gay's claims lack merit. But habeas courts *do* encounter cases that are "remarkable" both for the "abject" failures that caused the conviction and for the many "years from the date of [the] conviction" that have passed before a court recognized the grievous errors. *Harris v. Senkowski*, 298 F. Supp. 2d 320, 321 (E.D.N.Y. 2004). This is such a case. This Court should be the one to correct this injustice.

2

## RELEVANT FACTUAL AND PROCEDURAL BACKGROUND

**A.    Glenn Terrell is fatally shot next to Telena Simmons, whose observations suggest that Petitioner William Gay could not have been the shooter.**

Shortly after 4:00 a.m. on January 20, 2008, Tr. 750 (T.77), it was "closing time" at the Crystal Lounge in the Bronx, Tr. 729 (T.56), and a "lot of people" were standing outside on the sidewalk, Tr. 733 (T.60); *accord* Tr. 751 (T.78), 970 (T.293); *see also* Trial Exhibit 2 (A.672) (crime-scene diagram); Trial Exhibit 13 (A.673) (photograph of front of bar).[1]

Bartender Telena Simmons exited the bar with Glenn Terrell, the decedent. Tr. 730 (T.57). Simmons stood just inside the doorway, smoking a cigarette. Tr. 731 (T.58). Terrell stood to her left, "leaning on the wall" with "his shoulder" and talking to Simmons. Tr. 731-32 (T.58-59). For Terrell to have been standing to Simmons's left, his right shoulder must have been the one against the wall. *Accord* R&R at 3.

Simmons also saw William Gay standing outside the front door. Tr. 733-35 (T.60-62). Simmons recognized Gay as a regular bar patron but did not know him well enough to know his name; she called him "Boo." Tr. 733, 735, 749 (T.60, 62, 76). From Simmons's perspective in the doorway, facing the sidewalk, Gay was to her right. Tr. 734 (T.61).

Based on Simmons's uncontested testimony, then, Terrell and Gay were on opposite sides of the door from each other, with Simmons standing between them.

---

[1] When referencing transcripts, the R&R cites ECF 15, a set of multiple transcripts, and uses the ECF pagination. For the Court's convenience, this memorandum cites the same ECF pagination and also includes in parentheses each transcript's internal pagination. Citations to ECF 15 are prefixed "Tr." Citations to the suppression hearing and trial transcript pagination are prefixed "H." and "T.", respectively.

Citations to Petitioner's appendix, ECF 2-1–2-3, are prefixed "A." Citations to Respondent's Supplemental Appendix, ECF 13-1–13-6, are prefixed "SA."

Simmons "gave [Gay] a kiss, said hi." Tr. 734 (T.61). After Simmons "had just kissed" Gay, Terrell told Simmons, "You going home with me tonight." Tr. 737 (T.64). The "next thing that [Simmons] remember[ed]" was that, in response to Terrell's statement, she "turn[ed her] head because [she] was excited about" Terrell's proposition. *Id.* As she turned her head, she heard what she thought was a "fire cracker" and her "ear was just ringing." Tr. 737-38 (T.64-65). A police report documented her saying she heard the ringing in her "left ear." SA.181. Simmons kept turning toward Terrell and saw him on the ground. Tr. 738 (T.65).

Asked, "Did you see who had shot [Terrell]?" and "Did you see anyone with a gun?", Simmons answered "No" both times. Tr. 752 (T.79). She did not see Gay after hearing the gunshot. Tr. 740 (T.67). Simmons testified that after Terrell was shot, she "stood there … a few minutes because [she] was in shock." Tr. 739 (T.66).

The R&R notes that, according to a police report, Simmons told police she heard Gay say, "Yo is that him" before the gunshot. R&R at 3 (quoting SA.181). The R&R omits that an earlier report documents Simmons as saying she "heard *someone* say, 'there he is.'" SA.180 (emphasis added). When Simmons herself testified for the first time, at trial, she did not claim to have heard Gay say anything.

Debra Davis was "working as security" at the Crystal Lounge that night. Tr. 798 (T.125). At closing time, she was "escorting everybody to the door to put them out." Tr. 810 (T.137). Davis testified that "[t]he guy that got shot, he was the last one to leave the bar." *Id.* According to Davis, "He went out, I locked the door and I turned around and I heard a pop." *Id.* Davis, like Simmons, did not see the shooting or see anyone with a gun. Tr. 811, 817 (T.138, 144).

Importantly, when Davis was asked, "how long after the young man that got killed left the bar did you hear that pop," she answered, "It wasn't even five seconds." Tr. 813 (T.140);

4

*accord* Tr. 816 (T.143). Davis thus tended to corroborate Simmons's account that Simmons had had time only to greet Gay and start turning her head toward Terrell before hearing the gunshot.

Based on Simmons's and Davis's accounts, if Gay, at Simmons's right, had shot Terrell, at Simmons's left, then Gay would have had to reach across Simmons's field of vision to do it, firing the gun directly in front of Simmons's face as she turned from Gay to Terrell. Respondent does not dispute this, agreeing that Terrell was shot when Simmons had "just kissed" Gay and was "turn[ing] to Terrell." ECF 14 at ECF p. 16. The R&R also does not dispute that Gay would have had to fire the gun in front of Simmons's face. *But Simmons did not see the actual shooting or see anyone with a gun.* Tr. 752 (T.79). Her testimony thus strongly suggested that Gay could not have been the one who shot Terrell.

Consistent with the medical examiner's finding that Terrell was killed by a single bullet that entered *behind his right ear*, Tr. 860-62 (T.187-89), Simmons's testimony suggested that someone in the crowded area in front of the bar came from behind Terrell—to Simmons's left, out of her field of vision—and shot Terrell.

Hours after the shooting, Simmons identified Gay in a photograph as the man to the right of the doorway whom she had greeted. Tr. 58-59 (H.15-16). She described Gay as 5'10" and 180 pounds, with "bulging" eyes, wearing a dark jacket and a "fitted skully cap, a knit skull cap." Tr. 129 (H.85); *accord* Tr. 990 (T.312) ("dark knit hat"). Debra Davis also identified Gay as having been outside the bar. Tr. 68-72 (H.25-28).

**B.    Andrew Brown claims he saw a man briefly standing over the fallen victim and twice fails to identify Gay as that man.**

Andrew Brown told police he did not see the shooting, but he claimed he heard a gunshot and then saw a stranger standing over Terrell's fallen body. Tr. 66 (H.23); Tr. 943-44 (T.267-68). According to Brown, this man wore a dark jacket and a "Yankees baseball cap," Tr. 116

5

(H.72); Tr. 974 (T.297)—not the fitted knit cap Simmons described Gay as wearing. Brown described the man as 30-40 years old, 5'10" and 160 pounds, with a goatee and "big eyes." Tr. 116-17 (H.72-73). Gay was then 24 years old. *See* A.200.

The day of the shooting, Detective Raymond Rosado had Brown look at photographs on the NYPD Photo Manager System of people roughly matching the description Brown had given. Tr. 117-18, 123 (H.73-74, 79). Brown looked at the photographs for 20-30 minutes but didn't pick anyone. Tr. 125-26 (H.81-82); Tr. 975 (T.298). Gay's photograph was in this system, but Rosado could not say whether Brown saw Gay's photo. Tr. 119-20 (H.75-76).

The same day, Rosado showed Brown a photo array that included Gay's photo in position three. Tr. 66-67 (H.23-24); A.197 (photo array). Brown "look[ed] at the photo array" but did not identify anyone; according to Rosado, Brown said that "if he saw this guy again he could definitely recognize him but he had a hard time looking at the photos." Tr. 67 (H.24).

On January 21, the day after the shooting, despite Brown's failure to identify Gay from his photo, Rosado issued an "I-card" for Gay's arrest "as a perp," which, according to NYPD policy—and the Fourth Amendment—must be based on probable cause. A.831-32.

On January 27, 2008, despite supposedly already having probable cause to arrest Gay, Rosado again showed Brown "the same copy of the photo array" with Gay's photo, and Brown *again* did not identify anyone. Tr. 77 (H.33). According to Rosado, Brown said, "I told you I'm not good at photos." *Id.* There was never—at the suppression hearing or elsewhere—any testimony about why Brown had spent 20-30 minutes looking at photographs in the Photo Manager system if he was "not good at photos."

6

**C.**     **Despite Simmons's statements exculpating Gay and Brown's repeated failure to identify Gay, police arrest Gay and put him in a lineup, where Brown, able to deduce that Gay is the police suspect, now identifies Gay.**

On January 22, two days after the shooting, Gay reported to his parole officer. *See* Tr. 28, 32 (02/07/12 Tr. 28, 32). Gay was on parole for a 2003 drug-possession conviction, his only previous felony conviction. Tr. 254-55 (07/02/12 Tr. 6-7). On January 30, after Gay's parole officer told him "the police were looking for him," Gay again reported to his parole office and was arrested. Tr. 36 (02/07/12 Tr. 36).

On January 31, 11 days after the shooting, Rosado put Gay in a lineup that Brown and Simmons viewed. Tr. 80–84 (H.36-40). Number one in the lineup was 41 years old, and number six also appears substantially older than Gay, who was then just 24. *See* A.198-99 (Hr'g Exhibits 4A and 4B, lineup photographs); A.200 (Hr'g Exhibit 5 and Trial Exhibit 25, Line-Up Report). Simmons again identified Gay as the man she had greeted before the shooting. Tr.100-01 (H.56-57).

Gay, in position five, was the only person in the lineup who appeared in the photo arrays (and the Photo Manager system) Brown had previously viewed. Tr. 161-62 (H.117-18). Gay thus obviously was the police suspect. Unsurprisingly, Brown now identified Gay in the lineup as the person he had seen standing over Terrell. Tr. 94 (H.50).

After Brown viewed the lineup, the police had Brown sign a Line-Up Report, Tr. 95 (H.51), which identified number five, Gay, as the "Suspect," A.200—thus reinforcing Brown's perception that his selection of Gay must be "correct" because Gay was the person police believed to be the shooter.

On or about February 6, 2008, a grand jury indicted Gay for second-degree murder, first-degree manslaughter, and second-degree criminal possession of a weapon. A.837-39. Gay remained in custody pending trial.

7

**D.    Gay's lawyers do not seek to suppress Brown's identification on Fourth Amendment grounds, and the court denies Gay's motion to suppress based on unduly suggestive police procedures.**

Because the prosecution's Voluntary Disclosure Form misleadingly claimed that witnesses viewing photographs had "identif[ied Gay] as a person who committed a crime," A.840, when in fact no witness claimed to have seen the shooter, Gay's first lawyer, Harry Forman, did not move to suppress the identifications on Fourth Amendment grounds, instead moving only to suppress them based on unduly suggestive procedures. A.874 ¶ 4; *see* A.842-45.

By the time of the suppression hearing, Cesar Gonzalez had replaced Forman as Gay's court-appointed lawyer. Detective Rosado was the only witness at the hearing. He testified to Simmons's pre-lineup statements: she was standing at the bar's front door and greeted Gay. Tr. 56 (H.13). "[I]mmediately after this she hear[d] a gunshot," and "[w]hen she look[ed] over," she saw Terrell on the ground. *Id.* Simmons said Gay was "the closest person" to Terrell before the gunshot, implying other people also were nearby (as indeed Simmons and Brown would testify at trial). Tr. 61 (H.18). While Detective Rosado claimed that Simmons told him she had heard Gay "say something to the effect of is this the guy right here," there was no testimony that Simmons perceived this comment to concern Terrell. *Id.*

Rosado testified along the lines detailed at pp. 5-6, *supra*, about Simmons's and Brown's descriptions of the men they saw, Tr. 116-17, 129 (H.72-73, 85), and the two photo arrays in which Brown failed to identify Gay, as well as Brown's viewing of Photo Manager photos for 20-30 minutes, Tr. 66-67, 76-77, 195-96 (H.23-24, 32-33, 150-51).

Rosado did not testify that Simmons, Brown, or anyone else claimed to have seen the shooting or to know who shot Terrell.

Defense counsel argued that Brown's lineup identification must be suppressed as the result of undue suggestion, especially because Brown had twice failed to recognize Gay in the

photo array and then viewed a lineup in which Gay was surrounded by new fillers. Tr. 210 (H.165). Although the hearing evidence showed that Simmons would have seen Gay shooting Terrell if Gay had done it; Brown did not identify Gay as the person standing over Terrell; and, contrary to the prosecutor's Voluntary Disclosure Form,  no one had identified Gay as the shooter, Gonzalez did not seek to suppress Brown's lineup identification on the basis that police had seized Gay without probable cause before the lineup.

The court denied the motion without even discussing Gay's main argument: that Brown's repeated pre-lineup viewings of Gay's photo made the identification procedures unduly suggestive. *See* A.206-10. While counsel had not raised the Fourth Amendment issue, the court wrote that Rosado had probable cause to arrest Gay for the lineup "[o]nce … Simmons[] identified the defendant's photograph … *as the perpetrator* on January 20." A.208 (emphasis added). As shown above, this finding was incorrect: Simmons never identified Gay "as the perpetrator." Gonzalez did not object to this crucial error and still did not make any Fourth Amendment argument.

Due to a conflict of interest, Gonzalez was replaced by Edward Dudley, Jr., before trial. Tr. 239-41, 247 (02/28/12 Tr. 2-4, 10). Dudley also made no application related to the Fourth Amendment issue.

**E.     The trial**

> **1.      Telena Simmons and Debra Davis give testimony strongly suggesting Gay could not have been the shooter.**

As detailed at pp. 3-4, *supra,* Telena Simmons testified that she encountered Terrell and Gay at the Crystal Lounge's doorway, Terrell stood to her left and Gay to her right, and as she was turning from Gay to Terrell, she heard but did not see the gunshot. Debra Davis testified that she heard the gunshot not "even five seconds" after Terrell exited the bar. Tr. 813 (T.140); *see*

9

pp. 4-5, *supra*. As explained above, Simmons's and Davis's accounts established that Simmons would have seen Gay shoot Terrell if Gay had been the shooter; that she did not see the shooting strongly suggested that Gay was *not* the shooter.

Simmons testified that Gay was a regular at the bar, Tr. 735 (T.62), and she had socialized with him, but "only once": "One night I was in the bar, after the bar closed we went and hung out and that's it," Tr. 736 (T.63). She and Gay "didn't have a relationship," and he never "tr[ied] to call [her] or bug [her] about going out or anything like that." Tr. 749 (T.76). She didn't even know Gay's real name. *Id.*

The parties stipulated that, the day of the shooting, Simmons had described Gay as wearing "a dark knit hat." Tr. 990 (T.312).

> **2.**   **Andrew Brown testifies that, after consuming at least five alcoholic drinks, he heard a gunshot and saw a man in a Yankees cap standing over the fallen victim.**

Andrew Brown testified he had "been to jail quite a few times," Tr. 981 (T.303), for robbery and drug offenses, Tr. 936-37, 980-83 (Tr. 260-61, 302-05). He had used crack cocaine since the 1990s and been in rehab several times—most recently "earlier this year," Tr. 977 (T.299), although he "left before it ended," Tr. 979 (T.301).

At about 1:25 a.m. on January 20, 2008—two and a half hours before the shooting—he "had a few vodkas" at home and then left to sell a DVD player because he had no food. Tr. 937 (T.261). He "had a couple of drinks with" some acquaintances. Tr. 938 (T.262). At about 4:00 a.m., he went to the Crystal Lounge. Someone inside expressed interest in the DVD player and he waited outside while she consulted her husband. Tr. 940-41 (T.264-65).

Brown indicated that, from the perspective of a person facing the bar, he stood "to the right of the window closer to the Western Beef," a neighboring business. Tr. 941 (T.265). Brown's testimony meant that, from the perspective of Simmons, standing in the bar's doorway

10

with Terrell to her left, Brown was standing still further off to her left, beyond where Terrell was. Like Simmons, Brown testified that there were "people coming out" of the bar and "[i]t was crowded" outside. Tr. 943, 970 (T.267, 293).

Brown "heard a shot." Tr. 942 (T.266). He "didn't actually see the shooting," but he "turned around and [Terrell] was falling to the ground." Tr. 943 (T.267). Terrell fell "to the left of the door, in between the door and the window," *id.*, which was the same location where Simmons had placed Terrell.

Asked, "when you saw this guy hit the ground … [did] you s[ee] anyone in close proximity to him," Brown testified he saw "a black African American man standing over him and he had an object in his hand" that was "black." Tr. 943-45 (T.267-69). Asked if he could tell what the black object was, Brown said, "Not really, because like I said, I was like shocked by seeing this guy on the ground being shot and, you know, I was backing up…. [M]y first instinct was to run …. [I]t was mind blowing." Tr. 944-45 (T.268-69). The man standing over Terrell, who was a stranger, "looked directly at" Brown, then "turned around and walked away." Tr. 945-46 (T.269-70). Brown, claiming he would "never forget" the man's face, Tr. 963 (T.286) (notwithstanding his failure to recognize Gay as that man during the photo procedures), identified Gay in the courtroom as that man, Tr. 946 (T.270).

While Simmons had told police that Gay, whom she recognized from previous occasions, was wearing a "knit hat," Brown testified that the stranger he saw was wearing "a Yankee hat, baseball cap." Tr. 974 (T.297).

Brown testified that he had previously identified Gay in a lineup. Tr. 954 (T.277). He acknowledged that, before the lineup, he had twice viewed photo arrays and did not select anyone. Tr. 949-51 (T.273-274A). Brown claimed this was because he "wasn't comfortable with

11

pictures." Tr. 950 (T.274). However, contradicting that testimony, he was then shown the photo array in evidence and testified without hesitation that he could see that number three was Gay, who was sitting at the defense table. Tr. 983-84 (T.305-06). Brown also acknowledged that, the night of the homicide, he had looked through other photographs for "twenty to thirty minutes" and selected no one. Tr. 975 (T.298). He did not explain why he had done this if he "wasn't comfortable with pictures."

On cross-examination, the defense learned that, the day before Brown's testimony, he was "brought" to the D.A.'s Office, where the prosecutor had items "all spread out." Tr. 962-63 (T.285-86). Brown saw the lineup photograph and recognized Gay in it. Tr. 961-63 (T.284-85). Again, Brown did not explain how he could readily recognize Gay in this photograph if he "wasn't comfortable with pictures."

### 3.    Other witnesses

A crime-scene diagram in evidence showed that, from the perspective of a person in the bar's doorway facing the street, a shell casing was found to the right of the doorway. A.672. NYPD Detective Jonathan Fox testified that the casing was matched to a semiautomatic handgun, Tr. 768, 778 (T.95, 105), which the parties stipulated was used in a later crime, when Gay was in jail, and was recovered during an unrelated investigation, Tr. 758-59 (T.85-86).

Detective Fox testified that a semiautomatic handgun generally ejects spent shells "to the right and to the rear" of the gun. Tr. 772 (T.99). He thus agreed with the prosecutor's question that the place "where this casing was found at the scene" was "consistent" with the shooter standing "to the right of this door." Tr. 775-76 (T.102-03).

However, on cross-examination, Fox admitted that the shell's landing spot had essentially no probative value. When a casing "hits hard pavement, it could roll," Tr. 785 (T.112), or "[a]bsolutely" could "bounce any way," and, in an area with "pedestrian traffic," like the

12

crowded sidewalk here, it "could have been kicked in a different direction," Tr. 788 (T.115). Indeed, Fox testified, "*I could drop that casing ten times and it could land [in] different spots every time.*" Tr. 786 (T.113) (emphasis added). Therefore, he agreed, he could not say where the shooter was standing. Tr. 791-92 (T.118-19).

Dr. Carolyn Kappen, who performed Terrell's autopsy, concluded that he was killed by a gunshot to the "back right side of his head," "above" and "behind" the ear. Tr. 860 (T.187). The wound indicated that the gun was fired in "loose[] contact" with Terrell's head. Tr. 865 (T.192). Thus, "the muzzle of the gun … was to the right of the decedent" when fired. Tr. 895 (T.220).

The prosecutor presented a hypothetical: If a person was in the bar's doorway, and the shooter was to her right and the victim to her left, would that be consistent with Terrell's wound? Tr. 880-84 (T.206-10). Clearly, this question was meant to account for the unlikelihood that Gay, standing to Terrell's left, had fired point blank at the *right* side of Terrell's head.

Over defense objection, Dr. Kappen speculated that a shooting victim, seeing a gun, "*may start to duck or to run or to get down …. [M]aybe* he turned a little bit, went to duck down, gets shots there." Tr. 884-85 (T.210-11) (emphasis added). On cross-examination, Dr. Kappen agreed she did not know with any "medical certainty" that the shooting had occurred this way. Tr. 893 (T.218). There was no evidence to suggest it had.

Finally, the court allowed the prosecution to elicit testimony about Gay's supposed consciousness of guilt. The prosecution had alleged that Gay, required to be home during parole-related curfew hours, was not home when Warrant Squad detectives looked for him pursuant to the I-card. Gay's lawyer noted that Gay had twice reported to parole after the shooting, the second time after he was told the police were looking for him, resulting in his arrest, Tr. 37-39 (02/07/12 Tr. 37-39), which was "inconsistent with someone who's evincing a consciousness of

guilt," Tr. 40 (02/07/12 Tr.  40). The court "d[id]n't think that the evidence of flight [wa]s particularly convincing since the defendant did show up at his parole officer," Tr. 250 (07/02/12 Tr. 2), but nonetheless allowed the Warrant Squad detective to testify, Tr. 251 (07/02/12 Tr. 3).

Detective Daniel Rivera testified that, on January 24 and 25, 2008, he "[v]isited" Gay's address, but he didn't say what he did there. Tr. 836, 841 (T.163, 168). On January 27, he "visited" Gay's apartment at 6 a.m. but got "no answer"; he didn't explain what he did that wasn't answered. Tr. 841-42 (T.168-69). On January 28, he "just canvassed the area around" Gay's home. Tr. 842 (T.169). Rivera testified that he arrested Gay on January 30, Tr. 843 (T.170)—though he didn't explain he had done so when Gay voluntarily reported to parole, since the court had kept out Gay's parole status as unfairly prejudicial.

The trial judge, then–New York Supreme Court Justice Ann Donnelly, observed outside the jury's presence that Rivera's testimony "doesn't really create the inference that the defendant wasn't at a place where he was supposed to be." Tr. 904 (T.229). Nevertheless, she allowed the prosecution to offer evidence that Gay was obligated to be at home at certain hours—through a "parole [o]fficer" if necessary. Tr. 839 (T.166). To avoid risking that a parole officer would reveal Gay's parole status, defense counsel was forced to stipulate to Gay's obligation to be home between 9 p.m. and 7 a.m. Tr. 916-17 (T.241-42).

The only defense witness, Gay's mother, testified that, in January 2008, her son William lived with her, and in the ten days before his arrest, no one had knocked on her door or rang her doorbell before she left for work between 7:00 and 7:30 a.m. Tr. 918-20 (T.243-45).

### 4.    Summations, jury charge, verdict, and sentencing

After both sides rested, defense counsel Dudley unsuccessfully moved for a trial order of dismissal based on legally insufficient evidence of Gay's guilt. Tr. 998-99 (T.320-21).

14

In summation, Dudley argued, based on Simmons's testimony and Terrell's wounds, that the shooter must have come from behind Terrell and could not have been Gay. Tr. 1016 (T.338). The prosecutor's summation was rife with improper argument to which counsel did not object, which is discussed in more detail in Point III.C.4, *infra*.

When charging the jury, the court incorrectly said *eight times* that Brown had observed "the perpetrator" or identified Gay as "the perpetrator," Tr. 1057-59 (T.378-80), when in fact, Brown never claimed that he saw the man standing over Terrell commit the shooting. Counsel did not object or ask the court to correct these repeated misstatements of the evidence.

The afternoon of the second day of deliberations, the court received a note in which "[s]everal of the jury members ha[d] expressed concerns about their safety going home," as they "ha[d] all crossed paths with members of both [Terrell's and Gay's] families." Tr. 1088 (T.409). Simultaneously, the jury sent a note saying it had reached a verdict. Tr. 1089 (T.410). The court invited input regarding the first note, but neither counsel responded. *Id.* The jury returned its verdict, finding Gay guilty of murder and criminal possession of a weapon. Tr. 1090-93 (T.411-14). The court later sentenced Gay to 25 years to life in prison. Tr. 1108-09 (Sent. Tr. 14-15).

### F.    Post-trial investigation and N.Y. C.P.L. § 440.10 motion

In June 2019, the Office of the Appellate Defender ("OAD") filed a post-conviction motion on Gay's behalf under N.Y. C.P.L. § 440.10, arguing, *inter alia*, that Gay's attorneys were ineffective under *Strickland v. Washington*, 466 U.S. 668 (1984), based on the errors raised in Point III, *infra*. A.795-817, 819-25. OAD also argued that Gay was actually innocent. A.826-28. In support of the ineffectiveness claim, OAD obtained an affirmation from Dudley, Gay's trial counsel. A.852-55. That affirmation is discussed as relevant below. OAD also obtained an affidavit from an expert on eyewitness identifications, Dr. Nancy Franklin. A.856-67.

In July 2020, the court denied Gay's 440 motion without a hearing. A.937-1001.

15

**G.    The Appellate Division affirms Gay's conviction, the New York Court of Appeals denies leave to appeal, and this timely petition follows.**

Gay simultaneously appealed his judgment of conviction and the denial of his 440 motion. A.1002. He argued, in relevant part, that the evidence was legally insufficient, A.1047-53; Brown's identifications resulted from a Fourth Amendment violation and unduly suggestive procedures and should have been suppressed, A.1057-65; the prosecutor's misconduct in his opening and closing statements denied Gay a fair trial, A.1068-76; and Gay's lawyers were ineffective for the reasons raised in the present petition, A.1079-91.

On December 20, 2022, the Appellate Division affirmed Gay's conviction. *People v. Gay*, 211 A.D.3d 589 (1st Dep't 2022); A.1137-40. Its decision is discussed below as relevant.

Gay asked the New York Court of Appeals to review all federal constitutional issues he had raised in the Appellate Division and specified those claims. A.1153. The Honorable Jenny Rivera held a telephone conference on the application, *see* A.1158, but on May 31, 2023, the Court denied Gay leave to appeal, A.1160. His conviction became final on August 29, 2023, at the end of his 90-day period to seek Supreme Court review. *See Williams v. Artuz*, 237 F.3d 147, 150-51 (2d Cir. 2001). He timely filed this petition on August 26, 2024. ECF 1-3.

**H.    Magistrate Judge Tarnofsky issues a Report & Recommendation recommending the Court deny Gay's petition.**

After Gay's habeas petition was fully briefed, this Court referred the case to a magistrate judge, the Honorable Robyn F. Tarnofsky. ECF 19. On February 9, 2026, Magistrate Judge Tarnofsky issued a Report & Recommendation recommending that the Court deny Gay's petition and request for a hearing. R&R at 1. This Court granted Gay additional time to object to the R&R. ECF 22. The R&R's factual assertions and legal analysis are discussed as relevant below.

At the time of this filing, Gay is incarcerated at Green Haven Correctional Facility in Stormville, New York, serving his 19th year in prison for this conviction.

**STANDARD OF REVIEW**

For Rule 72 objections involving a "Prisoner Petition[]," the district judge "must determine de novo any part of the magistrate judge's disposition that has been properly objected to." Fed. R. Civ. P. 72(b)(3); *see also Nambiar*, 158 F.4th at 361 (holding that, contrary to some district courts' recent practices, objections to an R&R "should be considered *de novo*, even if they repeat an argument raised before the magistrate judge").

Under the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), "[i]f the state court denies a federal claim on the merits," then federal habeas relief should be granted if the state court's decision was "'contrary to, or involved an unreasonable application of, clearly established Federal law.'" *Jackson v. Conway*, 763 F.3d 115, 132 (2d Cir. 2014) (quoting 28 U.S.C. § 2254(d)(1)). "General legal principles can constitute clearly established law for purposes of AEDPA, so long as they holdings of [the Supreme] Court." *Andrew v. White*, 604 U.S. 86, 94 (2025). A state court unreasonably applies clearly established federal law if it "identifies the correct governing legal principle … but unreasonably applies that principle to the facts of the prisoner's case." *Jordan v. Lamanna*, 33 F.4th 144, 150 (2d Cir. 2022) (quoting *Williams v. Taylor*, 529 U.S. 362, 413 (2000)). If the petitioner's "federal claim was not adjudicated on the merits, 'AEDPA deference is not required, and conclusions of law and mixed findings of fact and conclusions of law are reviewed *de novo*.'" *Dolphy v. Mantello*, 552 F.3d 236, 238 (2d Cir. 2009) (quoting *Spears v. Greiner*, 459 F.3d 200, 203 (2d Cir. 2006)).

When AEDPA deference applies, the state court's application of the law to the facts "must be 'objectively unreasonable, not merely wrong.'" *Layne v. Kopp*, No. 1:21-CV-03989 (JLR), 2025 WL 869716, at *4 (S.D.N.Y. Mar. 20, 2025) (quoting *White v. Woodall*, 572 U.S. 415, 419 (2014)); *see also Harrington v. Richter*, 562 U.S. 86, 101 (2011) (AEDPA bars relief if

17

"fairminded jurists could disagree on the correctness of the state court's decision" (internal quotation marks omitted)).

However, while AEDPA's standard is strict, habeas corpus review, "by its nature, requires federal courts to, in the appropriate case, disagree with state judges on matters of federal law." *Young v. Conway*, 715 F.3d 79, 85 (2d Cir. 2013) (Parker, J., concurring in the denial of rehearing en banc). Thus, even after *Richter*, courts in this Circuit applying AEDPA have granted numerous habeas petitions, including where there was pronounced disagreement about the outcome. *See, e.g., Fuentes v. Griffin*, 829 F.3d 233 (2d Cir. 2016) (New York Court of Appeals affirmed conviction 5-2, district court denied certificate of appealability, and one member of Second Circuit panel dissented); *Scrimo v. Lee*, 935 F.3d 103 (2d Cir. 2019) (district court denied certificate of appealability); *Lynch v. Dolce*, 789 F.3d 303 (2d Cir. 2015) (same); *see also Garlick v. Lee*, 1 F.4th 122 (2d Cir. 2021); *Orlando v. Nassau Cnty. Dist. Attorney's Off.*, 915 F.3d 113 (2d Cir. 2019); *Young v. Conway*, 698 F.3d 69 (2d Cir. 2012); *Jimenez v. Graham*, No. 11-CV-6468, 2022 WL 2789217 (S.D.N.Y. July 15, 2022).

## ARGUMENT

### POINT I

> **Particularly in light of Telena Simmons's testimony that she stood face to face with William Gay but did not see him shoot Glenn Terrell, no rational juror could eliminate all reasonable doubt about Gay's guilt, and the R&R erroneously relies on highly speculative inferences to find otherwise.**

A.  ***Jackson v. Virginia* forbids conviction based on inferences that are merely "permissible" or "within the realm of possibility" but not "sufficiently supported" to establish guilt beyond a reasonable doubt.**

"[T]he Due Process Clause of the Fourteenth Amendment … forbids conviction 'except upon proof beyond a reasonable doubt.'" *Langston v. Smith*, 630 F.3d 310, 314 (2d Cir. 2011) (quoting *Jackson v. Virginia*, 443 U.S. 307, 315 (1979)). The ultimate question is whether, "after

18

viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Coleman v. Johnson*, 566 U.S. 650, 654 (2012) (emphasis omitted) (quoting *Jackson*, 443 U.S. at 319). "[T]he evidence must be viewed in its totality, as each fact may gain color from others." *United States v. Landesman*, 17 F.4th 298, 319 (2d Cir. 2021) (quoting *United States v. Cassese*, 428 F.3d 92, 98-99 (2d Cir. 2005)).

A petitioner with a *Jackson* claim "thus 'shoulders a heavy burden'"—"[b]ut it is 'not an impossible one.'" *United States v. Mackey*, 143 F.4th 129, 139 (2d Cir. 2025) (quoting *United States v. Jones*, 393 F.3d 107, 111 (2d Cir. 2004)). "While [the court must] resolve 'all *reasonable* inferences'" in the government's favor, "'specious inferences are not indulged.'" *Id.* (emphasis added) (quoting *United States v. Persico*, 645 F.3d 85, 104 (2d Cir. 2011); then *Jones*, 393 F.3d at 111). Even where AEDPA deference applies, "a conviction based on speculation and surmise alone cannot stand." *Langston*, 630 F.3d at 314 (quoting *United States v. D'Amato*, 39 F.3d 1249, 1256 (2d Cir. 1994)) (vacating assault conviction under AEDPA).

Put another way, "it is not enough that the inferences in the government's favor are *permissible*…. [T]he inferences [must be] *sufficiently supported* to permit a rational juror to find that the element … is established *beyond a reasonable doubt*." *Id.* at 314-15 (brackets and ellipses in *Langston*) (emphasis added) (quoting *United States v. Martinez*, 54 F.3d 1040, 1043 (2d Cir. 1995)). "[C]ourts cannot 'credit inferences *within the realm of possibility* when those inferences are unreasonable.'" *Id.* at 314 (emphasis added) (quoting *United States v. Quattrone*, 441. F.3d 153, 169 (2d Cir 2006)). "[I]t would not satisfy the [Constitution] to have a jury determine that the defendant is *probably* guilty.'" *United States v. Rodriguez*, 392 F.3d 539, 544 (2d Cir. 2004) (quoting *Sullivan v. Louisiana*, 508 U.S. 275, 278 (1993)).

19

Cases relying solely on circumstantial evidence, like this one, demand special scrutiny. With direct evidence, since the court must "defer to a jury's assessments with respect to credibility," *United States v. Lorenzo*, 534 F.3d 153, 159 (2d Cir. 2008) (quoting *Jones*, 393 F.3d at 111), the court's task often is simple: if a witness testifies, say, that she saw the accused shoot the victim, the court defers to the jury's crediting of that witness and upholds the conviction. By contrast, in a purely circumstantial case, the review necessarily is more searching, because "inferential leap[s]" are required to prove guilt, and "the strength of a particular piece of evidence turns on the specific circumstances that accompany the evidence." *United States v. Glenn*, 312 F.3d 58, 70 (2d Cir. 2002). Crucially, if circumstantial "evidence viewed in the light most favorable to the prosecution gives 'equal or nearly equal circumstantial support to a theory of guilt and a theory of innocence,' then 'a reasonable jury must necessarily entertain a reasonable doubt.'" *Id.* (quoting *United States v. Lopez*, 74 F.3d 575, 577 (5th Cir. 1996)); *accord United States v. Guldi*, 141 F.4th 435, 444 (2d Cir. 2025); *Lorenzo*, 534 F.3d at 159.

**B.     The R&R errs by making multiple inferential leaps that are not sufficiently supported by the circumstantial evidence to establish guilt beyond a reasonable doubt.**

The R&R relies on multiple inferences that may be "permissible" only in the narrow sense that they are "within the realm of possibility." *Langston*, 630 F.3d at 314 (internal quotation marks omitted). But that is not enough, as the cases cited above hold. Below, these inferences are addressed individually and then in their totality.

First, and most fundamentally, in reaching its overall finding that a rational jury could infer Gay's guilt, the R&R mostly sidesteps the key evidence giving rise to reasonable doubt: Simmons's testimony, corroborated by Debra Davis's testimony—both detailed at pp. 3-5, *supra*—that when Terrell was shot, Simmons was turning from Gay to Terrell, but Simmons

20

didn't see Gay shoot Terrell. This evidence pointed toward Gay's *innocence*. Any rational factfinder hearing this testimony would have to have reasonable doubt.

Yet the R&R, like the state courts and Respondent before it, never directly grapples with this tremendous source of reasonable doubt. The R&R does not dispute that if Gay was the shooter, he *must have* fired the gun in Simmons's face. *No one has ever disputed that.* But the R&R never explains how a jury faced with that unavoidable conclusion could somehow overcome all reasonable doubt about Gay's guilt. The R&R says that, "[a]lthough Simmons did not testify that she saw or sensed a shooting," her testimony that "her ears began to ring after she heard a loud noise … allowed an inference that someone close to Simmons had discharged a firearm." R&R at 26. It is true that the gun must have been fired close to Simmons, since Terrell, standing close to Simmons, was shot almost point blank. But that in no way overcomes the implication of Simmons's testimony that Gay could not have fired the gun. A ringing in Simmons's ear is perfectly consistent with someone else on the crowded sidewalk shooting Terrell, likely from behind and to the right of him, where the bullet entered his head, and outside of Simmons's sight.

The R&R's other finding relating to the significance of Simmons' testimony is that "it was within the jury's discretion to determine whether Terrell turned away upon seeing a firearm" and then was shot, R&R at 26-27, as Dr. Kappen speculated "may" have happened, *see* p. 13, *supra*. But this finding still does not inculpate Gay. Even if it were theoretically possible that Gay could have shot Terrell in the right side of his head because Terrell turned to run, Gay *still* would have had to reach across Simmons's field of vision to shoot at the fleeing Terrell. The R&R simply ignores that inescapable conclusion.

21

Having failed to explain away the exculpatory significance of Simmons's testimony, the R&R makes several more unsupported inferential leaps when marshaling other evidence to reject Gay's *Jackson* claim.

*Testimony about the shell casing.* As proof of Gay's guilt, the R&R cites Detective Fox's testimony that "the location of the shell casing was consistent with a shooter standing to the right of the bar's doorway." R&R at 25. But the significance the R&R gives to this circumstance is unsupported by the evidence. The R&R admits that Fox "acknowledged" that a shell "hitting a hard surface such as a sidewalk might not stay in the location where it landed and that bystanders outside the bar could have moved the casing." R&R at 12. But the R&R omits Fox's testimony much more fully undermining the significance of the shell's location: he conceded that he "could drop that casing ten times and *it could land [in] different spots every time*." Tr. 786 (T.113) (emphasis added). The R&R nowhere acknowledges this critical concession, which makes the location of the shell casing essentially insignificant on the question of Gay's guilt.

Gay argued in his petition that Detective Fox's testimony made it "unlikely" that the shell ejected precisely onto the spot where it was later recovered. R&R at 22 (quoting ECF 2 at 23-24). The R&R does not disagree this was unlikely, but it finds that "[t]he jury had the discretion to conclude that the shell casing landed close to where it was recovered rather than being deflected … , *even if it was an 'unlikely possibility*.'" R&R at 27 (emphasis added). But relying on "unlikely" inferences to condemn a man to possible life in prison is incompatible with *Jackson* and with due process. If it was unlikely that the shell landed precisely where it was found, then inferring it did land there would be sheer speculation. In effect, the R&R turns the burden of proof upside down; it was the prosecution's burden to prove beyond a reasonable doubt that Gay was the shooter, not Gay's burden to prove it couldn't possibly be him.

22

*The supposed consciousness of guilt evidence.* Here the R&R simply asserts that "a reasonable jury could infer consciousness of guilt" from Detective Rivera's testimony and the stipulation, forced upon the defense, that Gay was obligated to be home "during the hours the NYPD visited." R&R at 28. However, as detailed above, then-Justice Donnelly herself opined that Rivera's testimony "doesn't really create the inference that the defendant wasn't at a place where he was supposed to be." *See* p. 14, *supra*. The prosecution failed to elicit testimony establishing that Gay wasn't home when he was supposed to be, let alone that Gay was avoiding the police, let alone that Gay was avoiding the police because of the Terrell shooting, specifically. "[T]he strength of a particular piece of [circumstantial] evidence turns on the specific circumstances that accompany" it, *Glenn*, 312 F.3d at 70, and here the circumstances do not support an inference that Gay evaded police and did so because he was guilty of this crime.[2]

Even if, arguendo, it was reasonable to infer that Gay was not at home, that still would be extremely weak evidence of guilt. As New York's model jury instructions explain, "even an innocent person who finds himself or herself under suspicion may resort to conduct which gives the appearance of guilt." N.Y. Crim. Jury Instructions & Model Colloquies, "Consciousness of Guilt" (available on Westlaw by searching "CJI2D(NY) GA 10"); *accord People v. Bennett*, 79 N.Y.2d 464, 470 (1972) ("Consciousness of guilt evidence has consistently been viewed as weak because … [e]ven innocent persons, fearing wrongful conviction, may flee or lie to extricate themselves from situations that look damning."); *Wong Sun v. United States*, 371 U.S. 471, 483

---

[2] Although the jury did not hear that Gay twice reported to parole after the shooting, knowing the police were looking for him, thus firmly negating any inference of flight, *see* p. 7, *supra*, the due process and fairness principles the *Jackson* rule is meant to protect would be especially ill served by relying on the supposed flight evidence under these circumstances.

n.10 (1963). Certainly such tenuous evidence of "guilt" could not overcome Simmons's exculpatory testimony that she didn't see Gay shoot Terrell.

*Andrew Brown.* The R&R contends that a rational jury "could infer that the black object in the [hand of the man Brown saw] was the Handgun" and that "the man had used the Handgun to shoot Terrell." R&R at 27. This finding is unreasonable. A "black object"—of indeterminate size and shape—could be anything. Moreover, there was nothing inherently suspicious about Gay briefly pausing next to a body that had just dropped next to him, *which is precisely what Simmons testified that she, in shock, did after Terrell fell at her feet. See* Tr. 739 (T.66). It is unreasonable to jump from Brown's observation of Gay standing near Terrell, just like Simmons was, to the inference that Gay must have shot Terrell just because Gay was holding an unidentified object in his hand. Assuming Brown's identification of Gay as the person with the object was correct, that could not rationally resolve the reasonable doubt about Gay's guilt that arose from Simmons's testimony.

*The evidence considered in its totality.* Looking at the above evidence in totality, a rational jury of 12 people could not eliminate all reasonable doubt about Gay's possible guilt. Prosecution witness Simmons's testimony that she was turning from Gay to Terrell when she heard the gunshot but didn't see Gay shoot Terrell was exculpatory and uncontradicted; it required any rational person to conclude, at the very least, that there was reasonable doubt about Gay's guilt. None of the circumstantial evidence cited by the R&R contradicts Simmons's exculpatory testimony let alone independently establishes Gay's guilt beyond a reasonable doubt.

Dr. Kappen's testimony that Terrell "may" have turned to run as Gay shot him was impermissibly speculative, but even if it had happened that way, Simmons still would have had

24

to see Gay fire the gun, which she didn't. Dr. Kappen's testimony adds no weight to the Guilt side of the scale.

Detective Fox's testimony that the shell casing could land in a different spot ten times out of ten made it impossible, without speculating, to infer anything from this evidence. It too adds no weight to the Guilt side of the scale.

The supposed consciousness of guilt evidence, however one looks at it, does not add more than a feather's weight to counterbalance the heavily loaded Reasonable Doubt side of the scale, as shown above.

The supposed motive evidence—that Gay shot Terrell for propositioning Simmons—was so dubious the R&R doesn't rely it. Instead, the R&R implicitly acknowledges the "failure by the prosecution to support its theory of Petitioner's motive for the shooting," R&R at 27; *accord id.* at 63, but says this does not matter since motive is not an element of murder, *id.* at 28. But "[w]hile motive is not an element of murder … , the lack of evidence of motive speaks to the weakness of the People's case." *People v. Coke*, 238 A.D.3d 71, 79 (1st Dep't 2025) (internal quotation marks omitted).

The analysis thus turns to Andrew Brown's testimony with the scales still heavily tipped toward Reasonable Doubt. Brown does not overcome that weight. When considered together with Simmons's testimony, which was inconsistent with Gay being the shooter, all Brown's testimony proved (assuming his identification of Gay was correct) was that he observed Gay briefly standing near Terrell, after the shooting, with an object in his hand—the same thing Simmons did. Brown's failure to recognize the object as a gun deprives the observation of any significance.

25

In sum, Simmons's testimony strongly suggests Gay's innocence, and no evidence was sufficient to tilt the scale all the way toward proof beyond a reasonable doubt. Even assuming, arguendo, that the evidence cited by the R&R "raises a suspicion about [Gay's] involvement in the murder," that evidence is "not of the magnitude such that a reasonable juror could have inferred—beyond a reasonable doubt—that [Gay] was" the gunman. *Pilotti v. Superintendent, Great Meadow Corr. Facility*, 759 F. Supp. 1031, 1039 (S.D.N.Y. 1991). Since the only evidence of the weapon-possession charge was the same evidence just discussed, that conviction also must be vacated.

Because the R&R erred in finding that the state court reasonably applied *Jackson*, this Court should issue a writ of habeas corpus ordering Gay released from custody immediately and barring retrial. *See id.*

### POINT II

**Where Andrew Brown twice failed to identify William Gay in photo arrays, then saw Gay in a lineup with different fillers, thus revealing that Gay must be the police suspect, Brown's identification resulted from undue suggestion and was unreliable; the R&R erroneously minimizes the massively corrupting effect of these procedures.**

A.    **Due process prohibits the use of unreliable identifications resulting from undue suggestion.**

"[F]undamental fairness requires that … identification testimony be reliable." *Raheem v. Kelly*, 257 F.3d 122, 133 (2d Cir. 2001). For AEDPA purposes, the "clearly established federal law … regulating the introduction of eyewitness identification testimony" is as follows. *Brisco v. Ercole*, 565 F.3d 80, 88 (2d Cir. 2009). "The court must first determine whether the pretrial identification procedures unduly and unnecessarily suggested that the defendant was the perpetrator." *Id.* (quoting *Raheem*, 257 F.3d at 133). If they did, the court "must then determine whether the identification was nonetheless independently reliable." *Id.* (quoting *Raheem*, 257

26

F.3d at 133); *accord Manson v. Brathwaite*, 432 U.S. 98, 114 (1977); *Neil v. Biggers*, 409 U.S. 188, 199-200 (1972).

Ultimately, if identification procedures created "a very substantial likelihood of irreparable misidentification," then the witness may not testify about his out-of-court identification or make an in-court identification. *United States v. Douglas*, 525 F.3d 225, 242 (2d Cir. 2008) (emphasis omitted) (quoting *Simmons v. United States*, 390 U.S. 377, 384 (1968)); *accord Raheem*, 257 F.3d at 133.

**B.    Recent Second Circuit precedent and scientific studies show that identification procedures are unduly suggestive where, as here, a witness does not identify the suspect in a photo array and then is shown a lineup with the same suspect but different fillers.**

When considering identification challenges like this one, courts in this Circuit have "reference[d] an extensive body of scientific literature." *Young*, 698 F.3d at 78; *see also United States v. Nolan*, 956 F.3d 71, 80 (2d Cir. 2020); *Harris*, 298 F. Supp. 2d at 337. Such research shows that "'exposure to [the] defendant through multiple identification procedures'" is highly suggestive and creates a high risk of false identification. *Nolan*, 956 F.3d at 80 (quoting *Young*, 698 F.3d 79); *see Young*, 698 F.3d at 82 (citing finding that false lineup identifications more than doubled where witnesses "had seen a suspect in a prior mugshot"). Such "'mugshot exposure effect,' or 'unconscious transference'" causes "a witness [to] select[] a person in a later identification procedure based on a sense of familiarity deriving from her exposure to him during a prior one," rather than from exposure during the crime. *Young*, 698 F.3d at 82.

In a 2020 update to its influential 1998 white paper on identification procedures, the American Psychology-Law Society wrote that "[t]he importance of focusing on the first identification test [shown to an eyewitness] cannot be emphasized strongly enough," because "[a]ny subsequent identification test … is contaminated by the eyewitness's experience on the

27

initial test." Gary L. Wells et al., *Policy and Procedure Recommendations for the Collection and Preservation of Eyewitness Identification Evidence*, 44 Law & Hum. Behav. 3 (2020) (A.1183). According to another study by leading eyewitness-identification experts, the "empirical evidence unambiguously supports" this proposition. John T. Wixted et al., *Test a Witness's Memory of a Suspect Only Once*, 22 Psych. Sci. in the Pub. Interest 1S, 8S (2021) (A.1202). Thus, the belief that "it is possible to conduct an 'independent' test of memory" after an initial identification procedure already has occurred is "catastrophically mistaken." *Id.* at 15S (A.1209).

The danger of misidentification "is especially pronounced where, as here, the witness initially makes no identification from a photo array, but then selects someone whose picture was included in the photo array during a later identification procedure." *Young*, 698 F.3d at 82. Crucially, when, as here, "the suspect is the only person in common between the first and the second identification tests, *then it is clear to the witness which person the police suspect of having committed the crime*—the person in common to both procedures"—and "the lineup is *inherently biased* against the suspect." Wixted, *supra*, at 7S (A.1201) (emphasis added).

## C. The identification procedures used here, which allowed Brown to deduce that Gay must be the police suspect, were inherently unduly suggestive.

Brown twice saw Gay in photo arrays then, just days later, saw Gay in a lineup surrounded by new fillers. As the Second Circuit wrote in *Young*, and as the studies quoted above emphatically show, this series of procedures had the massively suggestive effect of letting Brown piece together that Gay must be the police suspect. This essentially amounted to detectives telling Brown, "This is the man." *Foster*, 394 U.S. at 443. (No one has ever contended that Gay looked different in the photo array and at the lineup, and the evidence shows that he looked the same in both. *See* A.197-98.) To make matters worse, the lineup itself was suggestive

28

in that one filler was 41 years old and another appeared also to be much older than Gay's age of 24, eliminating those two fillers from contention.

This scenario is at least as suggestive as the circumstances courts often deem unduly suggestive for singling out distinctive features. In *Raheem*, witnesses described the shooter as wearing a black leather coat; when shown a lineup in which only Raheem was wearing such a coat, the witnesses selected Raheem. 257 F.3d at 125-26, 135-37.[3] In finding this lineup unduly suggestive, the Second Circuit cited numerous similar cases. *See id.* at 134 (discussing case in which witness described gunman as not wearing a hat, and bareheaded suspect was put in lineup with four fillers wearing hats); *id.* (discussing case in which witness "stressed the youth and short stature of the perpetrator," and suspect in lineup "was one of only two" short participants, while "other short participant was demonstrably much older"); *id.* (discussing case in which all but one filler were "four-to-six inches taller than the defendant" and remaining filler was "65 pounds (i.e., 50%) heavier"); *id.* (discussing case in which assailant was described as wearing eyeglasses and accused was "only person wearing eyeglasses").

In each of these cases, it was unduly suggestive to use a lineup in which the suspect uniquely shared distinguishing features with the perpetrator. It is *at least* equally suggestive—arguably more so—to conduct a series of procedures that allow a witness, before he first identifies the suspect, to deduce which person must be the police suspect because that person is the only one included in all the procedures.

The R&R's analysis of this issue is flawed. First, the R&R contends, without explanation, that a suppression-hearing court could "credit Brown's explanation that he could not make a

---

[3] Both witnesses previously had made incorrect photo-array identifications of a man whom they believed was another participant in the crime. *Id.* at 126.

photographic identification. It would then not be unreasonable for a court to conclude that Brown did not recognize Petitioner in the photo array." R&R at 41. It is unclear if the R&R's argument is that Brown was somehow unable even to process faces in photographs and therefore he was not meaningfully exposed to Gay's face, or if the argument is only that Brown, though he could process the faces, for some reason could not identify people from photographs. Either way, neither argument has any basis in the scientific studies cited above or in common experience. Brown's excuse that he could not identify a person he recognized in a photograph is implausible on its face. Gay looked the same in the photo array and at the lineup, so if Brown truly recognized him from the crime scene, he should have been able to identify him.

Moreover, Brown's own actions in this case prove the falseness of his excuse. If Brown truly couldn't identify a person from a photograph, he would not have viewed Photo Manager photos at the police station for 20-30 minutes, and he would not, at the time of trial, have readily recognized Gay in both a Polaroid of the lineup and the photo array. *See* pp. 6, 12, *supra*. The R&R simply fails to address these points.

Accepting Brown's excuse as a reason to find these procedures not suggestive not only is unreasonable; it also would be extremely dangerous, because it would authorize police and prosecutors to manufacture lineup identifications by first exposing witnesses to the police suspect in multiple photo arrays. If Brown told police he could not recognize people in photos, then showing him the photos when a lineup was inevitable could have only one purpose: to signal to him who the police suspect was and to thereby influence his lineup identification.

The R&R cites two cases for the proposition that "law enforcement is permitted to conduct multiple identification procedures containing the same suspect": *Gousse v. Superintendent, Wende Corr. Facility*, No. 19-CV-1607 (JS), 2020 WL 4369643, at *18

30

(E.D.N.Y. July 29, 2020), and *Greene v. Brown*, No. 06-CV-5532 (LAP) (GWG), 2007 WL 1589449, at \*12 (S.D.N.Y. June 4, 2007). R&R at 41; *see also id.* at 40. But these decisions have nothing to say about this case, because both involved a witness who, unlike Brown, identified the petitioner during the *first* identification procedure. *See Gousse*, 2020 WL 4369643, at \*2 (witness identified petitioner in photo array then "identified Petitioner again in a lineup"); *Greene*, 2007 WL 1589449, at \*2 (witnesses "chose Greene's photograph" in array before both "chose Greene from the lineup").

Finally, the R&R contends that "Petitioner identifies no Supreme Court precedent requiring a conclusion that a lineup identification is unduly suggestive" under the circumstances here. R&R at 41. But as noted above, Gay does not have to present a case squarely on point. He has cited the "[g]eneral legal principles" that "constitute clearly established law for purposes of AEDPA"; the issue is whether the state courts unreasonably applied those principles. *Andrew*, 604 U.S. at 94. Gay has shown that they did, particularly in light of the "growing body of scientific research" that "has clarified and expanded what factors a court should examine in determining whether to exclude eyewitness identification testimony." *Nolan*, 956 F.3d at 80. Habeas courts are not required to rigidly adhere to decades-old precedents based on intuitions that scientific study has now disproven. *See Young*, 698 F.3d at 78-84 (on AEDPA review, invoking numerous post-conviction scientific studies to find identification improperly admitted).

In sum, there is an extremely high risk that Andrew Brown did not actually recognize Gay from the crime scene but rather deduced his way to identifying Gay. No court could reasonably have denied that these investigative procedures "unduly and unnecessarily suggested" to Brown that he identify Gay. *Raheem*, 257 F.3d at 133.

31

**D.      Brown's lineup and in-court identifications were unreliable, and thus their admission at trial violated due process.**

Gay agrees with the R&R that, because no state court reached the *Biggers*-factor analysis, review of that issue is de novo. R&R at 42. Below, these factors are discussed in turn.

Preliminarily, this Court must consider "the corrupting effect of the suggestive identification itself." *Manson*, 432 U.S. at 114. The R&R, erroneously finding the procedures not suggestive, did not do this. As shown above, the two photo-array viewings irreparably corrupted Brown's lineup and in-court identifications. Brown's in-court identification was further corrupted when he signed a Line-Up Report indicating he had selected the police "Suspect," and when the prosecutor allowed him to see a photograph of the lineup before testifying. *See* pp. 7, 12, *supra*; *Young*, 698 F.3d at 81 (in-court identification unreliable where it "followed three instances in which [the witness] was exposed to the defendant" (emphasis omitted)). The other *Biggers* factors reinforce this conclusion, contrary to the R&R.

*Factor 1: The "opportunity of the witness to view the criminal at the time of the crime."* Biggers*, 409 U.S. at 199.* The R&R errs in claiming this factor favors reliability. R&R at 43. Gay doesn't dispute that Brown's observation was "unobstructed." *Id.* at 42. He does object to the R&R's reliance on two pre-2000 cases saying that "a brief observation can still be reliable," R&R at 42, because this ignores recent studies showing that "a brief or fleeting contact is less likely to produce an accurate identification," *State v. Henderson*, 208 N.J. 208, 264 (N.J. 2011) (citing study). The R&R also fails to consider, under this factor, that the lack of daylight and the hat obscuring the face of the man Brown saw impaired Brown's opportunity to view him fully and clearly. *See id.*; *Young*, 698 F.3d at 80. This factor favors unreliability.

32

*Factor 2: The "witness' degree of attention."* Biggers*, 409 U.S. at 199.* Gay agrees that this factor "favors unreliability," because "Brown was shocked and backing away" and "had been consuming alcohol before the shooting." R&R at 43.

*Factor 3: The "accuracy of the witness' prior description of the criminal."* Biggers*, 409 U.S. at 199.* The R&R errs in claiming this factor favors reliability. R&R at 43-44. It cites general language saying this factor is satisfied if the witness's description "substantially matched [the] petitioner's characteristics." *Id.* at 44 (quoting *Brisco*, 565 F.3d at 92). But it unreasonably ignores Second Circuit precedent finding unreliability where a witness described a robber as being "in his twenties," while the petitioner was "almost 34," *Young*, 698 F.3d at 83—similar to the discrepancy between Brown's description of a man 30-40 years old while Gay was just 24, *see* p. 6, *supra*.

The R&R also asserts that a man of 160 pounds, as Brown described the man he saw, and a man of 210 pounds, as Gay was, look "substantially similar." R&R at 43. But a 5'10" man of 210 pounds would be substantially more muscular or heavy-set than a 5'10" man of 160 pounds. *Accord* Daniel E. Re & Nicholas O. Rule, *Heavy Matters: The Relationship Between Just Noticeable Differences in Perceptions of Facial Adiposity and Facial Attractiveness*, 7 Soc. Psych. & Personality Sci. 69, 71 (2015) (finding that a 5'10" man would need to lose or add just nine pounds "to alter their facial appearance toward looking noticeably lighter or heavier").[4]

Moreover, the R&R unreasonably dismisses the conspicuous discrepancy between the knit skull cap that Simmons saw on Gay and the Yankees baseball cap that Brown noticed on the man he saw. R&R at 44. A Yankees logo is a coarse, memorable detail that a person is likely to remember, like a distinctive tattoo. This factor favors unreliability.

---

[4] Available at https://rule.psych.utoronto.ca/pubs/2016/Re&Rule(2016_SPPS).pdf.

*Factor 4: The "level of certainty demonstrated by the witness at the confrontation."* Biggers*, 409 U.S. at 199.* The R&R erroneously found this factor to favor reliability, on the basis that Brown identified Gay "without hesitation" at the lineup and at trial. R&R at 44. Even if true, such apparent "certainty" means little where, as here, it "was engendered by the suggestive element [of the identification procedure] itself." *Raheem*, 297 F.3d at 139; *see also Young*, 698 F.2d at 82 (citing research that mugshot exposure causes witness to be more confident in eventual identification, even if identification is wrong). Moreover, "this *Biggers* factor … has come under withering attack … in light of considerable research showing that an eyewitness's confidence and accuracy have little correlation." *United States v. Greene*, 704 F.3d 298, 309 n.4 (4th Cir. 2013) (collecting scientific and judicial sources); *accord Haliym v. Mitchell*, 492 F.3d 680, 705 n. 15 (6th Cir. 2007).

*Factor 5: The "length of time between the crime and the confrontation."* Biggers*, 409 U.S. at 199-200. Gay agrees that the four-year delay between the shooting and trial favors unreliability as to Brown's in-court identification. R&R at 45. He disagrees that the 11-day delay before Brown's lineup identification favors reliability. *Id.* The R&R cites 2010 and 2011 district court decisions excusing longer delays, *id.*, but unreasonably ignores more recent Second Circuit findings that "even a one-week delay can" reduce identification accuracy to just 50%, *Young*, 698 F.3d at 84 (citing studies).

The *Biggers* factors weigh decisively against the reliability of Brown's identifications. It would be unreasonable to deny that there was "a very substantial likelihood of irreparable misidentification" in this case. *Simmons*, 390 U.S. at 384.

**E.    The erroneous admission of Brown's identification was not harmless.**

This Court must analyze de novo whether improperly admitting Brown's identification testimony was harmless, since no state court reached that issue. *Brown v. Davenport*, 596 U.S.

34

118, 137 (2022). Clearly, "admitting [Brown's] identification testimony had a 'substantial and injurious effect or influence in determining the jury's verdict.'" *Young*, 698 F.3d at 87 (quoting *Brecht v. Abrahamson*, 507 U.S. 619, 623 (1993)). "Identification testimony is at once the 'least reliable' form of evidence" and "'among the most influential' to a jury," *Harris*, 298 F. Supp. 2d at 336 (quoting *Kampshoff v. Smith*, 698 F.2d 581, 587 (2d Cir. 1983)), and the prosecution spent five transcript pages in summation highlighting (and misstating, *see* Point III.C.4, *infra*) Brown's testimony, Tr.1036-40 (T.357-61). The sentencing judge opined that Brown was "the really central witness in this case." Tr. 1107 (Sent. Tr. 13). Without Brown's identification, even the pervasive errors that likely caused Gay's conviction despite the insufficient evidence—detailed in Point III, below—would not have saved this conviction for the prosecution.

## POINT III

**The R&R erroneously minimizes the errors committed by William Gay's lawyers, which, considered cumulatively, deprived him of the effective assistance of counsel.**

### A.    Law governing ineffectiveness claims

"[T]o prevail on a Sixth Amendment ineffectiveness claim, a petitioner must prove (1) that counsel's representation 'fell below an objective standard of reasonableness'" and "(2) that 'there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.'" *Gersten v. Senkowski*, 426 F.3d 588, 607 (2d Cir. 2005) (quoting *Strickland*, 466 U.S. at 688, 694).

*Strickland*'s first prong is satisfied if counsel's errors "cannot be explained convincingly as resulting from a sound trial strategy, but instead arose from oversight, carelessness, ineptitude, or laziness." *Eze v. Senkowski*, 321 F.3d 110, 112 (2d Cir. 2003). While there is "a 'presumption that … the challenged action might be considered sound trial strategy,'" it is overcome if the

court can "see no strategic rationale for defense counsel's" conduct. *Nolan*, 956 F.3d at 83 (quoting *Strickland*, 466 U.S. at 689).

*Strickland*'s prejudice prong is satisfied if counsel's errors "undermine confidence in the outcome." *United States v. Melhuish*, 6 F.4th 380, 393 (2d Cir. 2021) (quoting *Wilson v. Mazzuca*, 570 F.3d 490, 502 (2d Cir. 2009)). This is "more likely" where the verdict is "only weakly supported by the record." *Henry v. Poole*, 409 F.3d 48, 64 (2d Cir. 2005) (quoting *Strickland*, 466 U.S. at 696). While this Court must "consider [counsel's] errors in the aggregate," *Lindstadt v. Keane*, 239 F.3d 191, 199 (2d Cir. 2001), "an isolated error" may be "sufficiently egregious and prejudicial" to warrant relief, *Murray v. Carrier*, 477 U.S. 478, 496 (1986).

**B.      Gay's lawyers were ineffective for failing to seek to suppress Brown's identification on Fourth Amendment grounds.**

**1.      Counsel may be ineffective under *Strickland* for failing to make a meritorious Fourth Amendment suppression motion.**

Where a person is arrested in violation of the Fourth Amendment and then identified in a lineup, the identification must be suppressed as "fruit … 'of the poisonous tree.'" *Young*, 698 F.3d at 77 (quoting *United States v. Crews*, 445 U.S. 463, 471 (1980)). A petitioner may show ineffective assistance based on "counsel's failure to litigate a Fourth Amendment [suppression] claim competently" if the Fourth Amendment claim was "meritorious" and "there is a reasonable probability that the verdict would have been different absent the excludable evidence." *Kimmelman v. Morrison*, 477 U.S. 365, 375 (1986).

Under the Fourth Amendment, probable cause for an arrest exists only when "an objectively reasonable police officer" has "knowledge or reasonably trustworthy information sufficient to warrant a person of reasonable caution in the belief that an offense has been or is being committed." *Rupp v. Buffalo*, 91 F.4th 623, 638-39 (2d Cir. 2024) (quoting *Ornelas v.*

36

*United States*, 517 U.S. 690, 696 (1996)). This "requires more than a 'mere suspicion[]' of wrongdoing." *Walczyk v. Rio*, 496 F.3d 139, 156 (2d Cir. 2007) (quoting *Mallory v. United States*, 354 U.S. 449, 455 (1957)). Further, "officers 'may not disregard facts tending to dissipate probable cause.'" *United States v. Pabon*, 871 F.3d 164, 175 (2d Cir. 2017) (quoting *Bigford v. Taylor*, 834 F.2d 1213, 1218 (5th Cir. 1988)).

In New York, when a lineup identification is suppressed on Fourth Amendment grounds, the witness may make an *in-court* identification "[o]nly if the prosecution can establish" by "'clear and convincing evidence' that the in-court identification was based upon observations of the suspect other than the [illegal] identification." *People v. Williams*, 41 N.Y.3d 551, 556 (2024) (quoting *People v. Ballott*, 20 N.Y.2d 600, 606 (1967)). The factors to be considered are similar to the *Biggers* analysis. *See id.* (citing *United States v. Wade*, 388 U.S. 218, 241 (1967); and *Crews*, 445 U.S. at 472-73).

### 2. Gay's lawyers unreasonably failed to pursue the meritorious Fourth Amendment suppression issue.

An objectively reasonable attorney would have recognized, and forcefully argued, that Simmons's and Brown's pre-lineup statements to police showed a lack of probable cause to arrest Gay and put him in the lineup at which Brown first identified him. Simmons's pre-lineup statements gave rise to the same exculpatory inference her trial testimony did. If, as Detective Rosado recounted, Simmons claimed she greeted Gay, "immediately after this she hear[d] a gunshot," and "[w]hen she look[ed] over," she saw Terrell on the ground, but she didn't see Gay shoot Terrell, then Gay could not have shot Terrell. *See* p. 8, *supra*.

The R&R contends that Simmons's statements to Rosado did not foreclose probable cause, because "[i]mmediately could be understood to mean soon after," such that "some time elapsed between the kiss and the shooting." R&R at 51-52. The implication appears to be that

there "could" have been a brief moment when Simmons looked away from Gay and therefore missed seeing the shooting. But this "could" is exceedingly speculative. Simmons's statements to Rosado gave every indication that Simmons was interacting with Gay when she heard the gunshot. That Simmons told Rosado she heard Gay say "Yo is that him" before the gunshot does not somehow suggest that Simmons looked away from Gay when the shot was fired. There was no evidence that she looked away or engaged with anyone else. A police officer of reasonable caution would interpret Simmons's testimony to mean it was unlikely that Gay was the shooter.

Moreover, any speculative assumption that "some time elapsed between the kiss and the shooting," R&R at 51-52, is inconsistent with Debra Davis's statement to police. Just as Davis testified at trial, she told police "she closed the bar door once [Terrell] stepped out," and "[a]s she closed the door she heard a pop." SA.192. Like her later trial testimony, this statement indicated that Terrell was shot mere seconds after he exited the bar, leaving no time for Simmons to turn her attention away from Gay and Terrell.

The R&R highlights Gay's supposed remark, "Yo is that him." R&R at 51 (citing SA.181). (As noted above, another report documents Simmons saying she "heard *someone* say, 'there he is.'" SA.180 (emphasis added).). But there was no evidence that Simmons perceived Gay's remark to concern Terrell, and given the exculpatory nature of Simmons's overall testimony, this ambiguous remark did not turn improbability into probability.

A second source of evidence undercutting probable cause was Andrew Brown. After telling police he "could definitely recognize" the man he saw standing over Terrell, Tr. 67 (H.24), Brown was twice shown Gay's photo and failed to recognize him. To any reasonable officer, these failures would have cemented the improbability of Gay's involvement. The R&R unreasonably dismisses Brown's non-identifications based, again, on Brown's excuse that "he

38

would need to see someone in person before making an identification." R&R at 52. As shown at p. 30, *supra*, this excuse is both facially dubious and contradicted by Brown's having previously spent 20-30 minutes looking at photos. No reasonable police officer would ignore the obvious exculpatory implication of Brown's two non-identifications.

Similarly, contrary to the R&R, *see* R&R at 51, no reasonable officer would believe Gay probably guilty just because Simmons's description of Gay overlapped in very general ways with Brown's description of the man he saw—not when Brown and Simmons described conspicuously different headwear and Brown had repeatedly failed to recognize Gay as the man he had seen, *see* pp. 5-6, *supra*.

The R&R claims two other pieces of evidence supported probable cause. The first was police being "unable to locate Petitioner in the days after the shooting." R&R at 51. In fact, the pre-lineup information available to police cut *against* probable cause. They knew that Gay, far from evading them, twice reported to his parole officer, including once when he knew the police were looking for him. *See* p. 7, *supra*. If anything, this shows consciousness of innocence, not of guilt. The R&R ignores this.

The R&R also cites the shell casing being found "near where … Petitioner had been standing." R&R at 51. But to an objectively reasonable murder detective, the location of the casing would not make it probable that one particular person of many on a crowded sidewalk was the shooter. After all, an NYPD detective, Fox, is the one who testified that the casing could have landed in a different spot ten times out of ten.

In sum, each piece of evidence the R&R analyzes either undercuts probable cause or utterly fails to counterbalance Simmons's and Brown's statements pointing *away* from Gay. No reasonable officer could have believed Gay was probably the shooter.

The R&R did not consider whether Gay's lawyers had legitimate reasons for failing to pursue Fourth Amendment relief. Gay showed in his initial memorandum of law that they did not; they simply missed the issue. *See* ECF 2 at 37-38.

The R&R also did not consider whether the prosecution could have established, by clear and convincing evidence, an independent source for Brown's in-court identification. This analysis is similar to the *Biggers* analysis, and as Gay has shown at pp. 32-34, *supra*, the prosecution could not have met its burden. Brown's in-court identification was even more gravely corrupted than his lineup identification, after he was shown the Line-Up Report identifying Gay as the police "Suspect" and then, the day before his trial testimony, shown a photograph of the lineup. Had counsel made the meritorious Fourth Amendment suppression motion, it is likely that Brown's critical identification would have been excluded. Counsel's omission was inexcusable.

**C.    Counsel committed numerous additional errors at trial that, considered collectively, denied Gay reasonably competent representation.**

**1.    Failure to correct the court's repeated misstatements, when charging the jury, that Brown had identified Gay as "the perpetrator"**

Starting with perhaps counsel's most damaging mistake during trial, he failed to object when the court incorrectly told the jury, eight times, that Brown had seen "the perpetrator" or "identified the defendant at a line-up as the perpetrator of the crime." Tr. 1057-59 (T.378-80). The Appellate Division agreed the court erred. *Gay*, 211 A.D.3d at 591. These misstatements, backed by the prestige and perceived superior knowledge of the trial judge, wrongly conveyed that if the jury credited Brown's identification, then Gay indeed was "the perpetrator."

The R&R does not dispute that the trial court erred, *see* R&R 67-69, but contends that counsel reasonably did not object, because "matter[s] of trial strategy and tactics … are virtually unchallengeable," *id.* at 69 (quoting *Murphy v. Warden of Attica Corr. Facility*, No.

40

20CIV3076PAEGWG, 2022 WL 1145050, at *11 (S.D.N.Y. Apr. 19, 2022)). But as the *Murphy* decision goes on to explain, defense counsel *must have had* an actual strategy for such deference to apply; counsel may be found ineffective where "there is no strategic or tactical justification." *Murphy*, 2022 WL 1145050, at *11. Here, counsel's omission was not strategic; rather, he averred that he "did not catch these statements" but "*would have objected* and asked for a correction" had he been paying attention. A.855 ¶ 20 (emphasis added).

The R&R contends this error was not prejudicial, because the judge elsewhere gave the standard instruction that her comments were not evidence, and "[t]he jury is presumed to have followed these instructions." R&R at 68-69. But "[a]lthough the law presumes that juries follow limiting instructions, … these instructions only minimize the evidence's prejudicial effect …. A limiting instruction 'does not invariably eliminate the risk of prejudice notwithstanding the instruction.'" *United States v. Curley*, 639 F.3d 50, 57 (2d Cir. 2011) (quoting *United States v. Figueroa*, 618 F.2d 934, 943 (2d Cir. 1980)). Here, the court's misstatement of crucial evidence was likely highly damaging, and it is unreasonable to conclude that a blanket instruction that failed to directly correct those misstatements meaningfully erased the prejudice.

### 2.    Failure to consult with or call an eyewitness-identification expert

While "*Strickland* ordinarily does not require defense counsel to call any particular witness," courts have found counsel ineffective for failing to call an eyewitness-identification expert to explain that "eyewitness testimony was sufficiently unreliable in ways not readily apparent to a lay jury." *Nolan*, 956 F.3d at 81-82; *see also Melhuish*, 6 F.4th at 398 (counsel ineffective where "Government's case 'rested centrally' on an issue for which defense counsel failed to offer expert testimony" (quoting *Gersten*, 426 F.3d at 608)). Here, as in *Nolan*, numerous factors surrounding a key eyewitness's identification, *see* Point II.B-D, *supra*, rendered the identification "highly unreliable for reasons beyond the ken of the typical juror,"

41

and counsel unreasonably failed to call an expert to elucidate those reasons. *Nolan*, 956 F.3d at 81 (internal quotation marks omitted). (By Gay's 2012 trial, the New York Court of Appeals had held that where, as here, "the case turns on the accuracy of eyewitness identifications and there is little or no corroborating evidence" against the accused, expert eyewitness-identification testimony must be admitted. *People v. LeGrand*, 8 N.Y.3d 449, 452 (2007)).

The R&R acknowledges "an expert witness could have raised doubts" about Brown's identification but contends that counsel's "cross-examination served that purpose" already, so any "expert would have been cumulative." R&R at 55. But this analysis ignores what happened in *Nolan*. There, defense counsel extensively cross-examined the eyewitnesses about factors undermining their identifications. *See Nolan*, 956 F.3d at 78 & n.6. But the Court found counsel ineffective for failing also to call an expert, because some of the factors "are counterintuitive and, therefore, not coterminous with common sense." *Id.* at 82 (quoting *Young*, 698 F.3d at 79). For example, jurors would not "necessarily understand that the detective's identification practices were highly suggestive." *Id.* The same is true here. Indeed, trial counsel's own remark in summation that "anybody that knows about the psychology of identification" would doubt Brown's identification, Tr. 1020 (T.342), keys in on the very danger *Nolan* highlighted. Counsel's failure to provide the very scientific grounding that he implicitly recognized was necessary contributed to his overall ineffectiveness.

### 3.   Failure to cross-examine Brown about discrepancies between his description of the man he saw and Gay's appearance

Counsel failed to elicit that Brown described the man standing over Terrell as 160 pounds and 30-40 years old, while Gay was 210 pounds and 24 years old. As discussed above, both the age and weight discrepancy were significant. *See* p. 33, *supra*. Although counsel challenged Brown's identification in other ways, he could have no strategic reason for not using these

42

discrepancies to further undercut Brown's identification. *See Harris*, 298 F. Supp. 2d at 338 (citing "a number of case precedents … railing against counsel's ineffectiveness for failing to challenge identification witnesses with prior inconsistent statements"). This omission at least contributed to counsel's overall ineffectiveness.

### 4. Failure to object to *any* of the prosecutor's improper, highly prejudicial remarks in his opening statement and summation

"The failure to object to prosecutorial misconduct can amount to ineffective assistance of counsel" because it "can have devastating consequences." *Stermer v. Warren*, 959 F.3d 704, 736-37 (6th Cir. 2020) (quoting *Hodge v. Hurley*, 426 F.3d 368, 377 (6th Cir. 2005)); *accord, e.g.*, *Quartararo v. Fogg*, 679 F. Supp. 212, 243-44 (E.D.N.Y.), *aff'd*, 849 F.2d 1467 (2d Cir. 1988).

While the R&R found that counsel's failure to object was not unreasonable on the basis that "matter[s] of trial strategy and tactics … are virtually unchallengeable," R&R at 61 (quoting *Murphy*, 2022 WL 1145050, at *11), Gay's counsel, again, had no strategy here. He did not object to any of the summation misconduct only because "he generally did not object to summation comments." A.761 ¶ 254. Such a rigid practice was not a strategy at all, especially when faced with numerous improper, highly prejudicial remarks, the worst of which are highlighted below. *See Quartararo*, 679 F. Supp. at 247 ("[G]eneral policies … are not policies based on strategy: they are policies grounded in negligence." (quoting *Crisp v. Duckworth*, 743 F.2d 580, 587 (7th Cir. 1984)); *see also id.* ("[A] '*policy* of never objecting to improper questioning is forensic suicide." (quoting *United States v. Wolf*, 787 F.2d 1094, 1099 (7th Cir. 1986) (emphasis in *Wolf*))).

First, there could be no excuse for failing to correct the prosecutor's false arguments that the "presumption of innocence" lasts "until the moment that you go and start deliberating" or, even worse, is removed *during trial* with "every piece of … evidence." Tr. 1045 (T.366). It is

43

elementary—to lawyers, not to juries—that "the presumption of innocence disappears" only "[o]nce a defendant has been afforded a fair trial and convicted." *Herrera v. Collins*, 506 U.S. 390, 399 (1993); *see also People v. Alfaro*, 260 A.D.2d 495, 496 (2d Dep't 1999) ("clear impropriety" to "state[] that the presumption of innocence was 'gone' or 'vanquished'"). In arguing that this was merely "an argument that the prosecution had satisfied its burden," R&R at 62, the R&R unreasonably dismisses a direct misstatement of one of the fundamental rules governing criminal prosecutions. *See United States v. Friedman*, 909 F.2d 705, 709 (2d Cir. 1990) (vacating conviction where prosecutor "undermine[d] the presumption of innocence" and "the Government's obligation to prove guilt beyond a reasonable doubt").

Second, counsel did not object when the prosecutor "misstate[d] the evidence." *United States v. Smith*, 778 F.2d 925, 929 (2d Cir. 1985). Although Brown denied seeing a gun, the prosecutor waved around the murder weapon and falsely claimed, "[t]his is the gun that Andrew Brown saw in [Gay's] hand," and Brown "basically testified to you that [Gay]'s the killer." Tr. 1027-29 (T.349-51). This was not merely an "invitation to the jury to conclude" that Gay was guilty, R&R at 63—it was an outright misrepresentation of Brown's testimony.

Third, while the R&R agrees that "the evidence did not support a conclusion that Petitioner and Simmons were linked romantically," R&R at 63, it unreasonably excuses the prosecutor's false argument that Gay had "spent the night" with Simmons, Tr. 676 (T.4); *see* Tr. 1028 (T.350), and that Simmons "tells you why this happened. Because these two men had this woman in common," Tr. 1029 (T.351). The R&R contends that counsel had "little incentive" to object because "motive is not an element of the charged crimes." R&R at 63. Element or not, however, motive plainly can be powerful evidence of intent and overall guilt—and here, the prosecutor simply made it up, without objection.

44

Fourth, the prosecutor "inflame[d] the jury," *Quartararo*, 679 F. Supp. at 243, by invoking gratuitous, gory images of Terrell's "brains" being "blow[n] … out' and "pulpif[ied]," Tr. 1027 (T.349); *see* Tr. 1044, 1048 (T.365, 369), and of Terrell lying "in a massive pool of his own blood," Tr. 678 (T.6). The R&R unreasonably minimizes these "efforts to incite the jury by emphasizing the brutal nature of [the] murder," which "went beyond the bounds of proper argument." *Quartararo*, 679 F. Supp. at 243; *see* R&R at 63.

Finally, the R&R agrees it was "likely … improper" for the prosecutor to argue that Terrell "'had a right not to be murdered,'" but says this was not prejudicial because of the court's blanket instruction that "counsel's arguments are not evidence." R&R at 64 (quoting Tr. 1046 (T.367)). As cases like *Quartararo* show, however, counsel *may* be ineffective for "sitting on his hands" during an improper summation; the standard blanket instructions alone cannot cure the unchecked prejudice. *Quartararo*, 679 F. Supp. at 244.

### 5.       Failure to request a consciousness-of-guilt jury charge

The prosecutor spent two transcript pages in summation telling the jury that Gay's supposed evasion of police was "devastating evidence of this defendant's consciousness of guilt" and proved him "guilty as sin" (which was highly disingenuous and misleading, as he knew Gay had been arrested precisely *because* he reported to parole). Tr. 1041-43 (T.362-64); *see also* Tr. 678 (T.1109). Defense counsel should have poured cold water on that inflammatory and unfair argument by requesting the standard New York jury instruction on consciousness of guilt, discussed at p. 23, *supra*. Counsel failed to do so for no reason that he could recall. A.855 ¶ 19. It is unreasonable to assume, as the R&R does, that in this extremely weak case, in which the prosecutor spent two transcript pages in summation emphasizing Gay's supposed flight, a warning to the jury not to put too much weight on such argument would "not have added anything" to Gay's defense. R&R at 67.

45

**6.      Failure to request an inquiry of the jurors after they reported being afraid of Terrell's family**

In New York, a court must dismiss a sworn juror who is "grossly unqualified to serve." *People v. Dukes*, 8 N.Y.3d 952, 953 (2007) (quoting *People v. Buford*, 69 N.Y.2d 290, 298 (1987)). Jurors have been dismissed after expressing "fears" based on "liv[ing] and work[ing] in the neighborhood where the crime" occurred, *People v. Wilson*, 295 A.D.2d 272, 272 (1st Dep't 2002); *accord People v. Baum*, 54 A.D.3d 605, 606 (1st Dep't 2008). A court that has "credible information" about such potential disqualification "must conduct a 'probing and tactful inquiry'"—a so-called *Buford* inquiry. *People v. Kuzdzal*, 31 N.Y.3d 478, 486 (2018) (quoting *Buford*, 69 N.Y.2d at 299). Here, just as in *Wilson* and *Baum*, Gay was entitled to a *Buford* inquiry after "[s]everal" jurors "expressed concerns about their safety" after "cross[ing] paths with members of [Gay's and Terrell's] families." Tr. 1088 (T.409); *see* ECF 2 at 46-47.

In rejecting this argument, the R&R describes the jury note as "*merely stat[ing]* that some jurors had 'crossed paths with members of both [Petitioner's and Terrell's] families.'" R&R at 72 (emphasis added) (quoting Tr. 1088). But the R&R omits that the jurors "*expressed concerns about their safety* going home." Tr .1088 (T.409) (emphasis added). Under *Wilson* and *Baum*, the trial court could not have refused at least to inquire into those safety concerns. Nor could defense counsel have brushed the note aside; if multiple jurors feared for their safety, there was strong risk such fears would influence their verdict. A lawyer who did not demand to know more was not zealously representing his client. Counsel's excuse—that the jury had reached a verdict, so he "did not believe there was anything to do," A.855 ¶ 21—was incorrect. The verdict had not yet been announced, and anyway, a *Buford* inquiry can be made after a verdict is read. *See People v. Sanchez*, 99 N.Y.2d 622, 623 (2003). This error, too, at least contributed to counsel's overall ineffectiveness.

46

**D.    Considered cumulatively, counsels' numerous errors prejudiced Gay.**

This Court must review the prejudice issue de novo. The state courts considered the prejudice caused by only one of counsels' multiple errors, *see* ECF 2 at 48, so no court ever considered the cumulative prejudice caused by counsels' multiple errors, as *Strickland* requires.

Most prejudicial was counsels' failure to make the winning Fourth Amendment argument to suppress Brown's identification. As discussed above, if counsel had done this, the case "would have been effectively over." *Nolan*, 956 F.3d at 81. This is thus the kind of unjustifiable, case-dispositive omission that alone makes out ineffectiveness. The R&R, having found no error on this issue, did not address whether it was prejudicial.

Counsel's numerous further errors at trial, piled up one after another, help account for why the jury reached a guilty verdict on such weak evidence. First, counsel's failure to call an expert so the jurors would understand just how corrupted Brown's identification was, and also to elicit the additional inconsistencies between Brown's description and Gay's appearance, could well have cost Gay his freedom. Contrary to the R&R, achieving some effective cross-examination is not enough when additional powerful avenues of attack are not pursued, as the Second Circuit held in *Nolan*. *See*, Point III.C.2-3, *supra*.

After the evidence came in, counsel disastrously failed to insulate the jury from the multiple damaging influences discussed in Point III.C.1, 4-6, *supra*. The jury heard no objection to blunt the prosecutor's poisonous summation remarks. It was not cautioned about the limited probative value of the misleading flight evidence that the prosecutor hammered in summation. With no correction, the jury absorbed the court's repeated assertions that Brown had identified Gay as the "perpetrator." The extreme danger of improperly priming a jury toward guilt in this way is unignorable. As discussed above, blanket instructions could not be relied on to cool the jury's passions or cure the numerous legal and factual misstatements it heard from the prosecutor

47

and trial judge, whose prestige likely "induce[d] the jury to trust the Government's [and court's] judgment rather than its own." *United States v. Young*, 470 U.S. 1, 18-19 (1985).

Meanwhile, the jury's note strongly suggests that fear may have influenced it to return a guilty verdict that the evidence didn't support.

In a case as extraordinarily weak as this one, it would be unreasonable to hold that this compounding series of errors, each one uncorrected by counsel, did not prejudice William Gay. There is at least a reasonable probability that the outcome of this case, which never should have gotten to trial, would have been different had counsel adequately protected his client.

## CONCLUSION

It is deeply troubling that William Gay has spent almost 20 years in prison without Respondent or any court having explained away the exculpatory implication of Telena Simmons's testimony. It cannot be explained away. Whether on *Jackson* grounds, or because of the long series of additional errors by the prosecution, the court, and Gay's lawyers that are detailed above, the Court should grant this petition.

In the alternative, Gay respectfully requests a certificate of appealability stating that, as to all claims raised in his petition, he has made a substantial showing of the denial of a constitutional right.

Dated:      March 9, 2026

/s/ Jacob Loup
Jacob Loup
Law Offices of Joel B. Rudin, P.C.
Carnegie Hall Tower
152 West 57th Street, 8th Floor
New York, New York 10019
(212) 752-7600
(212) 980-2968 (fax)
jloup@rudinlaw.com
*Attorney for Petitioner William Gay*

48